FEDERAL DEPOSIT INS. CORP., in
its Corporate Capacity, Plaintiff,

v.

James P. BREWER, Defendant.

James P. BREWER, Third–
Party Plaintiff,

v.

FEDERAL DEPOSIT INS. CORP., in its
Corporate Capacity, Plaintiff/Intervenor,

v.

John R. BRYAN, et al., Third–
Party Defendants.

No. Civ. A. No. J86–0300(W).

United States District Court,
S.D. Mississippi, Jackson Division.

April 20, 1993.

Douglas Gunter, Jackson, MS, for plaintiff.

Alan Perry, David W. Clark, Harry E. Neblett, Jr., Jackson, MS, James H. Herring, Canton, MS, Richard M. Edmondson, Matthew M. Moore, Earl Keyes, David M. McMullan, Jr., Edwin S. Williams, Harris B. Henley, Jr., Erwin C. Ward, Jackson, MS, for defendants.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Before the court is the motion of the plaintiff, the Federal Deposit Insurance Corporation (hereinafter "FDIC"), for summary judgment pursuant to Rule 56,[1] Federal Rules of Civil Procedure, in the above styled and numbered cause against the defendant, James P. Brewer (hereinafter "Brewer"). The controversy between the parties centers upon two promissory notes executed by Brewer and whether FDIC should be able to collect upon them. This court's jurisdiction over the controversy is invoked pursuant to 12 U.S.C. § 1819[2] and 28 U.S.C.

---

1. Rule 56(a) of the Federal Rules of Civil Procedure provides:

 (a) For Claimant. A party seeking to recover upon a claim, counterclaim, cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

2. Title 12 U.S.C. § 1819 provides in pertinent part:

 (a) In General

 Upon June 16, 1933, the Corporation [Federal Deposit Insurance Corporation] shall be-

§ 1345.[3] In its summary judgment motion, FDIC states that on December 2, 1983, Brewer executed two renewal promissory notes in favor of The Mississippi Bank (hereinafter "TMB"), due on demand, but if no demand, then due on January 16, 1984. Asserting that Brewer has made only partial payment on these two notes, FDIC, as the receiver for the now failed TMB, contends that it is entitled to a judgment against Brewer for the unpaid balance of the notes because Brewer has no valid defenses at law to thwart FDIC's claim. Persuaded that FDIC's claim is meritorious and further persuaded that under the disputed facts Brewer has no colorable defenses to FDIC's claim, this court grants summary judgment to FDIC. The court's reasoning is set out below.

## I. FACTS

In early December of 1982, Brewer met with W.P. McMullan, Jr., Chairman and Chief Executive Officer of TMB, and Joe Denson, Executive Vice President of TMB, to discuss the terms of a stock purchase. A letter dated December 6, 1982 and signed by Joe Denson (the "Denson Letter")[4] acknowledges that Brewer, McMullan and Denson held a discussion regarding the purchase of 8% or 62,283 shares of First Mississippi National Corporation stock from the Employee Stock Option Plan (ESOP) of TMB. The letter confirms an agreement reached among the three of them for Brewer or his business entity, Capital Security Services, Inc., to purchase the stock and for TMB to finance 100% of the purchase. The letter also states that the investment would be for a period of 18 months, and that neither Brewer nor Capital Security would suffer any loss as a result of this investment.

In order to ensure Brewer's purchase of the ESOP stock, Denson and McMullan persuaded Brewer to execute two promissory notes in favor of TMB on December 7, 1982. Note No. 61386 in the amount of $1,183,-377.00 was secured by the 62,283 shares of common stock in the First Mississippi National Corporation. Note No. 61385 in the amount of $124,566.00 was a 360–day demand note with no collateral. When these notes came due in December of 1983, Brewer paid the accrued interest and executed two renewal notes in the same principal amounts as the original notes. The first of these two renewal notes, No. 61385, continued to be due on demand; however, the note provided that if no demand was made within 360 days, the note would be due and payable on January 16, 1984. The second renewal note, No. 61386 and executed on the same date as the first, continued to be secured by the 62,283 shares of common stock in the First Mississippi National Corporation.[5]

---

come a body corporate and shall have such power—

> **Fourth.** To sue and be sued, and complain and defend, in any court of law or equity, State or Federal.

**3.** Title 28 U.S.C. § 1345 provides:

> Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.

**4.** The letter states as follows:

> Mr. Jim Brewer:
> Per our conversations regarding investment in common stock of the First Mississippi National Corporation, this is to confirm our agreement. You and/or Capital Security Services, Inc. will purchase 8% or 62,283 shares of First Mississippi National Corporation at $21.00 per share. It is understood that current book value is approximately $26.53 per share. It is further understood that this investment is to be for a period of

up to 18 months and that upon sale of McMullan family stock to any purchase of said stock, this 62,283 shares will be included in the sale block at the same price received by the McMullan family.

> In addition, this stock is to be financed 100% by The Mississippi Bank plus any interest payments and there is to be no loss suffered by Jim Brewer or Capital Security Services, Inc.
> s/ Joe N. Denson

**5.** According to Brewer, pursuant to the purported agreement confirmed by the "Denson letter", TMB loaned Brewer the money to purchase the ESOP's shares of First Mississippi National Corporation. Brewer pledged the stock as security for the TMB loan and executed a promissory note. When the original note became due, Brewer borrowed money from TMB to pay the interest on the loan and executed two renewal notes, one for principal and one for the interest. The two notes now before the court are renewal notes for the principal amount of Brewer's loan from TMB and a second loan from TMB taken to pay interest due on the first.

On May 11, 1984, pursuant to Miss.Code Ann. § 81–9–5 (1972), the Mississippi Commissioner of Banking and Consumer Finance determined that TMB was insolvent and closed the bank. The Commissioner then obtained a judgment from the Chancery Court for the First Judicial District of Hinds County, Mississippi which declared that TMB indeed was insolvent. Upon a bank's failure, the courts usually appoint the FDIC as a receiver pursuant to 12 U.S.C. § 1821(c) and (e). Thereafter, the FDIC will determine whether the future course for the failed bank should proceed either to liquidation or to a "purchase and assumption transaction," where the FDIC arranges for the sale of the failed bank's assets and deposit liabilities to another solvent bank. *See Federal Deposit Insurance Corporation v. Jenkins,* 888 F.2d 1537 (11th Cir.1989).

Thus, in keeping with the customary procedure, the Chancery Court entered a judgment which appointed FDIC as the receiver for the failed bank. FDIC accepted the appointment pursuant to 12 U.S.C. § 1821(e) and filed a bond as required by Miss.Code Ann. § 81–9–21 (1972). Then, in its capacity as receiver, FDIC took possession and control of TMB and entered into a court-approved sale of certain TMB assets and liabilities to the Grenada Bank. FDIC did not part with the two promissory notes in question, however, but retained them in hopes of collecting on them.

FDIC then began its efforts to collect on the two promissory notes. FDIC first took steps to liquidate the First Mississippi Corporation stock pledged as collateral for note No. 61386. Brewer retained counsel and persuaded FDIC to cancel the liquidation sale because Brewer represented that he would be able to obtain a price higher than that being sought by FDIC. On March 21, 1986, Brewer executed an option to purchase which granted Bancorp of Mississippi first option on Brewer's 62,283 shares for $16.46 per share ($1,025,178.10). Bancorp agreed to buy the stock at that price. Then, Brewer attempted to obtain a complete release of all claims against him from FDIC in exchange for the $1,025,178.10, the proceeds of the Bancorp purchase. FDIC would not agree to release Brewer from liability for any deficiency; so, in exchange for FDIC's release of the 62,283 shares of common stock serving as security for note No. 61386 and in an effort to reduce the amount in controversy,[6] Brewer signed a Schedule 13D affidavit as required by the Securities Exchange Commission and paid FDIC the $1,025,178.10 on April 15, 1986. According to FDIC, $3,300.00 of the total amount was applied to the payment of attorney fees, $307,021.22 to accrued interest, and $714,856.88 was applied to principal, leaving an outstanding balance of $465,503.50.

Now, Brewer claims that he paid the $1,025,178.10 as full and final settlement of all FDIC claims against him. FDIC disagrees, asserting that it never agreed to release Brewer from his total obligation. When Brewer balked at paying any deficiency on the notes, FDIC filed this lawsuit to recover the deficiency amount still due and owing on renewal note No. 61386, plus the amount due on renewal note No. 61385, plus interest.

## II. ARGUMENT

FDIC argues that this is a simple collection case against Brewer and that there are no remaining issues of material fact. Firstly, argues FDIC, Brewer admits that he signed the promissory notes in favor of TMB. Secondly, says FDIC, Brewer made no payment on these notes until April of 1986, and that payment was only a partial satisfaction. Thirdly, states FDIC, Brewer raises no objection to the authenticity of the notes.[7]

---

**6.** See the Certification of Brewer's attorney, Arnold D. Dyre, at pages 5–6.

**7.** See paragraphs 9 and 14 of Brewer's amended answer where he admits that he signed the renewal notes as the maker of those notes with interest to accrue at the New York Prime Floating Rate. See also Brewer's responses to FDIC's requests for admissions #8 and #9 wherein

Brewer admits being the maker of the notes in question. Brewer's assertion at his depositions that he did not recognize attached copies of the notes in question to be the same as the originals does not overcome his admission that he is the maker of the notes and that he signed them as the party to be charged. Additionally, the copies of the notes in question have been identified by

Therefore, concludes FDIC, Brewer is in default on the notes and the deficiency amounts plus accrued interest are due and payable.

In his first affirmative defense in response to the FDIC's complaint, Brewer contends that he entered into an agreement with Joe Denson, in Denson's capacity as an officer of TMB, that he, Brewer, would be held harmless from any loss on the stock purchase in question. The basis of Brewer's contention is the "Denson Letter" dated December 6, 1982 which, according to Brewer, constitutes an agreement to hold Brewer harmless from any loss related to this stock purchase. Brewer says that this agreement was reinforced by W.P. McMullan's oral assurances when the subsequent promissory notes were executed, and also by written agreements later entered into between Brewer and McMullan in his personal capacity.[8]

Brewer's second affirmative defense is accord and satisfaction. According to Brewer, the payment to FDIC of $1,025,178.10 in exchange for FDIC's release of the 62,283 shares of common stock serving as security for note No. 61386 relieved Brewer from liability for any further claims by FDIC under the promissory notes in question.

Brewer's third and fourth affirmative defenses allege tortious interference with a contractual relationship and fraud in the inducement. Brewer also asserts that FDIC did not take the promissory notes in question in

good faith and that TMB's alleged fraud rendered any agreement between itself and Brewer void.

Initially, Brewer asserted that FDIC had ignored its statutory mandate under 12 U.S.C. § 1823 by entering into a "Purchase and Assumption Agreement" rather than liquidating TMB. Brewer has since abandoned this defense.

The court has reviewed Brewer's affirmative defenses and has determined that these raised defenses are without merit and do not establish a genuine issue of material fact so as to preclude a grant of summary judgment in this case.

## III. THE "DENSON LETTER" AND BREWER'S ALLEGED "HOLD HARMLESS" AGREEMENT

■ Brewer claims that he had an agreement with TMB through Joe Denson that he would be held harmless in the event of any loss on the ESOP stock transaction. Exhibit 2 to Brewer's responsive pleading to FDIC's complaint is the "Denson letter." Brewer also relies upon the alleged oral assurances of W.P. McMullan. This court already has stated in a previous order that the "Denson letter" cannot be asserted as a defense against the claims of FDIC in this case because of the statutory prohibition contained in 12 U.S.C. § 1823(e)[9] and because of the

---

an employee of FDIC as business records kept in the ordinary course of TMB's business.

**8.** See the Securities Exchange Commission Schedule 13D affidavit executed by James P. Brewer on April 15, 1986 (exhibit 12 to FDIC's appendix to the motion for summary judgment). In summary, the Schedule 13D affidavit says that in September of 1983, Brewer and W.P. McMullan entered into a written agreement wherein McMullan personally agreed to find a buyer for the stock at a price of $21.00 per share. McMullan also executed a promissory note in favor of Brewer in the amount of $1,035,766.20, the purpose of which was to indemnify Brewer for any interest amounts incurred on the loans made to Brewer by TMB for the purchase of this stock. McMullan later defaulted on the promissory note, breached the written agreement, and filed for bankruptcy protection. Brewer filed a Proof of Claim in Bankruptcy Court. That dispute has no direct bearing on this case. Moreover, Brewer made this agreement with McMullan in his

personal capacity, not with McMullan as president of TMB.

**9.** 12 U.S.C. § 1823(e) provides as follows:

No agreement which tends to diminish or defeat the right, title or interest of the Corporation (FDIC) in any asset acquired by it under this section, either as a security for a loan or by purchase, shall be valid against the Corporation unless such agreement
(1) is in writing,
(2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank,
(3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(4) shall have been, continuously, from the time of its execution, an official record of the bank.

long established common law principle that "secret agreements" may not be used as a defense to a suit by the FDIC. Such secret agreements would tend to deceive the banking authorities. *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

Courts often consider the *D'Oench, Duhme* doctrine and § 1823(e) in tandem, looking to the common law when construing the statute. *Beighley v. Federal Deposit Insurance Corporation,* 868 F.2d 776, 784 (5th Cir.1989). In *Langley v. Federal Deposit Insurance Company,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the Court noted two purposes of 12 U.S.C. § 1823(e):

> ... to allow bank examiners to rely on a bank's records in evaluating the worth of the bank's assets.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> A second purpose of § 1823(e) is implicit in its requirement that an "agreement" not merely be in writing and on file in the bank's records, but also have been executed and become a bank record "contemporaneously" with the making of a note and have been approved by officially recorded action of the bank's board or loan committee. These latter requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with collusion of bank employees, when a bank appears headed for failure.

*Langley v. FDIC, supra,* at page 92, 108 S.Ct. at page 401.

■ The short of the matter is that Congress spelled out specific requirements for agreements to pass muster under § 1823(e). An agreement that meets the statute's requirements is valid even if the FDIC did not know of it; and any agreement that does not meet the statute's requirements will fail,

even if the FDIC knew of the agreement. *Langley v. FDIC, supra,* at page 94–96, 108 S.Ct. at page 403.

■ Since the "Denson letter" was not approved by TMB's board or loan committee and was not recorded in TMB's official minutes, such a document is, at best, merely a "secret side agreement" which was not apparent to bank examiners, and is not enforceable against FDIC either in its corporate or receiver capacity. *Beighley v. FDIC, supra,* at page 784; 12 U.S.C. § 1823(e); *D'Oench, Duhme & Co. v. FDIC, supra.*

The court reaches the same conclusion with regard to any alleged oral assurances of W.P. McMullan. Even if such oral assurances were actually made, these oral agreements were never approved by a board or loan committee of TMB or reflected in the minutes of the institution's business meetings. Similarly, even if the aforesaid September 28, 1983, written agreement [10] entered into between Brewer and McMullan in his personal capacity had any bearing on this case, it, too, would be subject to the statutory requirements of 12 U.S.C. § 1823(e).

In sum, there is no proof that the board or loan committee of TMB approved or ratified the "Denson letter" or any other agreement, oral or written, between Brewer and Denson, or McMullan with regard to the stock purchase in question. Under these circumstances § 1823(e) is explicit; the purported agreements are invalid against the FDIC's claim.

## ACCORD AND SATISFACTION

FDIC contends that Brewer has presented no proof that FDIC agreed to accept $1,025,178.10 as accord and satisfaction of all amounts due on the promissory notes in question. Instead, says FDIC, Brewer paid $1,025,178.10 only for release of the 62,283 collateralized shares of common stock on April 15, 1986.

■ Under Mississippi law Brewer is required to prove accord and satisfaction by clear and convincing evidence. *Ricks Lumber Company, Inc. v. Natchez Steel and*

---

**10.** See footnote 9 for the particulars of this circumstance.

*Pipe, Inc.,* 318 So.2d 883, 887 (Miss.1975). The four basic elements of an accord and satisfaction are:

(1) something of value offered in full satisfaction of demand;

(2) accompanied by acts and declarations which amount to a condition that if the thing offered is accepted, it is accepted in satisfaction;

(3) the party offered the thing of value is bound to understand that if he takes it, he takes subject to such conditions; and

(4) the party actually does accept the item.

Additionally, one of the essential elements of an accord and satisfaction is an agreement, or meeting of the minds of the parties. The agreement must have all the essentials of a contract and may be express, or implied from the circumstances. If these elements are not shown, then no jury issue has been made. *Cook v. Bowie,* 448 So.2d 286, 287 (Miss. 1984). So, to establish proof of accord and satisfaction, Brewer would have to show that there was an agreement between FDIC and himself that FDIC would accept the $1,025,-178.10 as full settlement of its claim; that there was execution of an accord which discharged the old claim; and that the parties intended that the payment constitute an accord and satisfaction. *See Woods–Tucker Leasing v. Kellum,* 641 F.2d 210, 213–14 (5th Cir.1981).

■ Brewer merely asserts that the matter of accord and satisfaction is a jury issue, an issue of material fact which should preclude the court from granting summary judgment to the FDIC. Of course, a mere plea for a jury trial upon the naked assertion that there are genuine issues of material fact is an insufficient response to a motion for summary judgment. The non-moving party is required to respond with proof of a *prima facie* case, sufficient for a jury to enter a verdict in his favor. *Washington v. Armstrong World Industries, Inc.,* 839 F.2d 1121, 1122–23 (5th Cir.1988), citing *Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–51,

106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). When the moving party has carried the Rule 56(c) burden, the opposing party must present more than a metaphysical doubt about the material facts in order to preclude the grant of summary judgment. *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corporation,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Brewer relies upon two of his own depositions [11] in support of his contention that there is a genuine issue of material fact regarding his assertion of accord and satisfaction. The court has reviewed these documents and finds that Brewer was unable to show any agreement having the essentials of a contract or any other express or implied meeting of the minds required for a clear and convincing showing of accord and satisfaction. Brewer admitted in these documents that he could point to no writing or other agreement that would substantiate his claim that the $1,025,178.10 was accepted by FDIC with the full understanding that there was to be an accord and satisfaction regarding the notes in question.

On the other hand, abundant evidence exists which thoroughly undermines Brewer's claim of accord and satisfaction. First, there is a letter written by attorney Jamie Houston, III, on behalf of FDIC dated April 4, 1986, just prior to Brewer's redemption of his collateral, which specifically states that FDIC was not to be limited in its efforts to collect any deficiency on the promissory notes in question. The letter of Jamie G. Houston, III, to Arnold D. Dyre, counsel for James P. Brewer, states the following:

FDIC's release of the collateral stock to Mr. Brewer for $1,025,178.18 will not in any way diminish, waive, release, compromise or otherwise adversely affect FDIC's ability to exercise any and all rights which it may have under the terms of the promissory notes executed by Mr. Brewer now owned and held by FDIC, without limitation, the right to collect any deficiency resulting from disposition of the collateral.

---

11. The deposition taken of James P. Brewer on August 8, 1986 and that taken of Brewer on May 2, 1987. Excerpts of these depositions are exhibited its 11 and 12 to Brewer's response to the FDIC's motion for summary judgment.

If the above letter does not put to rest Brewer's accord and satisfaction contention, then the court need only refer to Brewer's deposition dated May 2, 1987, wherein he responded to counsel's questions as follows:

Q: (by counsel) Even though one of the allegations contained in your Amended Complaint concerns accord and satisfaction, I think you will recall us discussing that subject the last time we were here about what statements FDIC made to you that payment of the $1,025,000.00 would extinguish the deficiency. Do you remember that discussion, that line of questioning?

A: (by Brewer) Yes, sir, I remember.

Q: Can you think of any other facts that support your contention that by paying $1,025,000.00 to FDIC, FDIC agreed to release you from any deficiency on the debt?

A: I remember the discussion, and just probably to summarize the reason I felt that the million dollars would be what they were looking for. Of course, I think I had identified you and another member of your firm at the last deposition. There were statements made that it would be written up this way, and I had interpreted that to be, well, we will write it up this way and see if it will be approved, and statements that were made to my attorney at the time, Mr. Dyre, by other parties that felt this would be. I don't know whether any of them came to the FDIC or not. I still strongly feel that the FDIC would have accepted that had it not been for some other reason.

Q: What other reason?

A: I feel that a lot of this is a vendetta. Personally I feel that way.

Q: A vendetta by the FDIC against you?

A: Right.

Q: Why, based on what?

A: Based on the fact that over, as I have covered in the past, over a few years there had been no desire to pursue this thing in a timely manner. They just, there were times that we could have discussed this or we did discuss it, but there was just no pursuit, and then all of a sudden overnight they were going to sell the stock because they thought they had the person picked out, and I think that had something to do with it. Now, that is a personal feeling just from some things that have gone on and all.

Deposition of James P. Brewer, pages 70–71.

As can be seen from Brewer's responses, his defense of accord and satisfaction stands solely upon nothing more than his own naked perception of the events in question. He presents no facts, documents or any other proof that he entered into an agreement with FDIC whereby FDIC would accept the $1,025,178.10 as full payment of his indebtedness under the two promissory notes.

Furthermore, Brewer's attorney for the redemption of the 62,283 shares of stock pledged to TMB, Arnold D. Dyre, presented a certification pursuant to the court's directive wherein he gives an account of events surrounding Brewer's efforts to have FDIC cancel its planned liquidation sale of the stock. Dyre explained as follows:

... Mr. Brewer had negotiated a deal with Bancorp of Mississippi, Inc., subject to FDIC approval and conditioned upon release by FDIC for deficiency upon the loans secured by First Mississippi National Corporation stock, to sell the 62,283 shares ... for $16.46 per share ($1,025,178.18). On April 3, 1986, I communicated by telephone with Mr. (Jamie G.) Houston in an effort to avoid the scheduled liquidation sale which was not expected to yield nearly as much as the $16.46 per share offered by Bancorp of Mississippi.... Mr. Houston agreed on behalf of FDIC to cancel the scheduled private liquidation sale and allow the release of the subject shares of stock for $16.46 per share; however, Mr. Houston stated that he did not have the authority to waive the FDIC claim for deficiency. It was a pressure situation in that if Mr. Brewer insisted on a complete release, the FDIC was going to proceed to sell the stock at less than what the Bancorp of Mississippi offer would yield.... I communicated to Mr. Houston Mr. Brewer's reluctant "agreement to disagree," meaning that Mr. Brewer's position was that he was not responsible for a deficiency

on the said loans due to the circumstances and the representations and assurances by The Mississippi Bank at the time of the initial stock acquisition ...; however, in order to maximize the realization on the stock and to reduce the amount in controversy, the release of the stock without waiver of the deficiency claim was accepted and Mr. Brewer agreed to execute an affidavit required by the FDIC. Mr. Brewer did not agree to pay the deficiency and Mr. Brewer did not waive his claim as asserted via the Proof of Claim filed in the receivership proceeding.

Certification of Arnold D. Dyre, at pages 5–6.

It is markedly clear from Mr. Dyre's certification that FDIC never agreed to accept $1,025,178.10 as full payment for all Brewer's indebtedness. It is also clear that FDIC refused to release its claim for a deficiency. Mr. Brewer's assertion that he did not agree to pay any deficiency is of no moment since he had already obligated himself to do so by signing the promissory notes in question. Not the "Denson letter" nor W.P. McMullan's oral assurances, nor any written agreement with McMullan in his personal capacity can serve to relieve Brewer of his obligations under the promissory notes.

Then, there is the deposition of Jan Levingston Maddox, an FDIC employee, taken by Brewer which supports the FDIC's contention that no agreement was ever made with Brewer that he would be released from any deficiency arising from the notes in question. The following colloquy took place at that deposition:

Q: During the time that you were involved in the Brewer transaction, ..., what statements, if any, were made while you personally were present to Mr. Brewer that would—in which it was agreed that FDIC would release Mr. Brewer for any deficiency on the loans?

A: There was never any statement made.

Q: Were there any implications or any statements that were made that could somehow lead Mr. Brewer to think such?

A: There were never any statements that we would release him. It was put to him that at a later time there may be some

discussion on it, but not anything to do with the sale of stock.

Q: From your perspective as the account officer responsible for these two loans, did you ever have any intent to release Mr. Brewer for the deficiency upon payment of the $1,025,000.00?

A: Not at all.

. . . . .

Against the above evidence, Brewer offers nothing save his unsubstantiated charge of an FDIC vendetta and his naked assertion that here there are genuine issues of material fact which should bar the court from granting summary judgment to FDIC. Brewer has met his duty under Rule 56. He has not shown that he has any proof to support a *prima facie* case of accord and satisfaction. Therefore, the court grants summary judgment to FDIC on Brewer's claim of accord and satisfaction.

### TORTIOUS INTERFERENCE WITH BREWER'S CONTRACT RIGHTS

 FDIC next attacks Brewer's claim of tortious interference with his contractual rights. FDIC avers that Brewer has produced no credible proof to support the claim. Brewer claims that FDIC forced him to sell the stock in question for only $1,025,178.10 at a time when FDIC knew the stock would be increasing in value. According to Brewer, he could have gotten a better price if FDIC had not forced the sale by announcing that it would sell the collateral itself. FDIC correctly notes that to prevail on this claim, Brewer must show: (1), that the acts of FDIC in attempting to collect the promissory notes were intentional and willful; (2), that these acts were calculated to cause damage to Brewer in his lawful business; (3), that the acts were committed purposely with the unlawful intent to cause damage and loss, without right or justifiable cause; and (4), that actual damage and loss resulted. *Irby v. Citizen National Bank of Meridian*, 239 Miss. 64, 121 So.2d 118, 119 (1960).

 Brewer's offered proof fails to establish a *prima facie* case. Brewer has pro-

pounded no evidence to show that the FDIC acted with malice or unlawful purpose when it acted to collect the promissory notes in question or to liquidate the collateral. Brewer's own deposition shows that he personally does not know of any actions by FDIC which would substantiate his claim of tortious interference. In response to FDIC's motion for summary judgment, Brewer essentially advances a "wait-and-see" argument, that is, that the court should provide him a jury trial on this issue, then wait and see what proof Brewer can muster on the issue. However, in response to a motion for summary judgment, the non-moving party is required to respond with proof of a *prima facie* case, sufficient for a jury to enter a verdict in his favor. *Washington v. Armstrong World Industries, Inc., supra.* Inasmuch as Brewer has failed to show such proof, the court is persuaded that FDIC is entitled to summary judgment on the claim of tortious interference with Brewer's contract rights.

### THE OTHER AFFIRMATIVE DEFENSES

Finally, Brewer has asserted broad claims of fraud, fraud in the inducement, and bad faith against FDIC. These claims question FDIC's conduct relative to its purchase and assumption proceeding with the Grenada bank and its efforts to collect amounts due on the promissory notes in issue here. However, Brewer offers nothing to support his claim that the FDIC defrauded him. Nor does Brewer submit any proof that the FDIC did not take the notes in question in good faith. Furthermore, because these defenses are predicated upon the agreement purportedly contained in the "Denson letter," they may not be maintained against the FDIC. *D'Oench, Duhme & Co. v. FDIC, supra; Beighley v. FDIC, supra; FDIC v. McClanahan,* 795 F.2d 512 (5th Cir.1986); *Chatham Ventures, Inc. v. FDIC,* 651 F.2d 355 (5th Cir.1981), *cert. denied,* 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982); *FDIC v. Hoover–Morris Enterprises,* 642 F.2d 785 (5th Cir.1981).

Summary judgment is proper in a case where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Typically, suits on promissory notes provide fit grist for the summary judgment mill. *FDIC v. Cardinal Oil Well Servicing Company, Inc.,* 837 F.2d 1369, 1371 (5th Cir.1988). Such is the case here.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that the motion of the FDIC for summary judgment is well taken and the same is hereby granted. A final judgment on the complaint of FDIC against James P. Brewer shall be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

**SO ORDERED AND ADJUDGED.**