**Revised February 22, 1999**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 98-50117

---

SMS FINANCIAL, LIMITED LIABILITY COMPANY,

Plaintiff - Appellant,

VERSUS

ABCO HOMES, INC.; ABBOTT CONSOLIDATED INDUSTRIES, INC.;
ABBOTT DEVELOPMENT COMPANY; H. EUGENE ABBOTT; RICHARD E ABBOTT,

Defendants - Appellees.

---

Appeal from the United States District Court
for the Western District of Texas

---

February 18, 1999

Before SMITH, DUHÉ, AND WIENER, Circuit Judges

JOHN M. DUHÉ, JR., Circuit Judge:

SMS Financial L.L.C. ("SMS"), sued to recover on a promissory note issued by ABCO Homes, Inc. ("ABCO"), Abbott Consolidated Industries, Inc. ("ACI"), Abbott Development Co. ("ADCO"), H. Eugene Abbott, and Richard E. Abbott (collectively, "Defendants"). SMS appeals on the following grounds the district court's grant of summary judgment for the Defendants: (1) it is the holder and owner of the note; (2) equitable estoppel; (3) limitations; (4)

commercially unreasonable disposition of collateral; and (5) no relation back of SMS's amended complaint. Because we hold that SMS is the holder of the note and find that genuine issues of material fact exist concerning the remaining issues raised by the Defendants, we reverse and remand to the district court for further proceedings.

## I.  Background

This appeal involves a promissory note made by the Defendants payable to the FDIC. ADCO was the maker of a previous note owed to Western State Bank of Midland. The FDIC took over that bank's operations when the bank failed. When ADCO defaulted on that note, the FDIC allowed the Defendants to refinance the debt through the note payable to the FDIC.[1] In 1993 the FDIC sold its note to SMS in a bulk sale of notes. The FDIC endorsed its note to SMS, but did not physically deliver it to SMS. Subsequently, SMS requested a refund of the purchase price for this note as provided for under the terms of their contract. The FDIC issued a refund check to SMS and requested return of the endorsed note.[2] Of course, SMS did not have possession of the note, and therefore could not return it. In 1997, the FDIC sent the note to SMS "in a box" with other documents.[3]

_____

[1]All of the Defendants were co-makers of this note.

[2]In 1994, the FDIC sent SMS a letter containing a check for $2,752.10, the amount SMS paid for the note, and the request for return of the note.

[3]There is no other explanation provided by the parties for the return of the note "in a box" except that it was inadvertently done.

2

SMS sued the Defendants on the note shortly after receiving it. The district court granted the Defendants' Motion For Summary Judgment as to all Defendants on the grounds that SMS was not the owner or holder of the note, as to ABCO on the additional ground of a settlement with the FDIC, and as to ADCO on the additional ground that the debt was discharged in bankruptcy.[4]

## II.  Discussion

### A.  Is SMS the holder or owner of the note?

SMS argues the district court erred in granting the Defendants' Motion for Summary Judgment because a fact issue exists concerning whether SMS is the owner or holder of the note.  We hold SMS is the holder of the note.

This court reviews the district court's determination de novo. See La. Bricklayers & Trowel Trades Pension & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co., 157 F.3d 404, 407 (5th Cir. 1998); see also Willis v. Roche Biomedical Lab., Inc., 21 F.3d 1368, 1370 (5th Cir. 1994).  We must determine whether the pleadings and summary judgment evidence demonstrate there is no genuine issue as to any material fact, and whether the Defendants are entitled to judgment as a matter of law.  Id. at 1371.

SMS argues it became the note's owner and holder through the FDIC's negotiation of the note in 1997 by delivery of the endorsed

---

[4]SMS does not appeal ABCO and ADCO's dismissal on summary judgment.

note to SMS. Alternatively, SMS contends it is the owner and holder of the note because the Defendants failed to prove the FDIC reacquired the note from SMS through the refund check in 1994.[5] SMS asserts the FDIC did not reacquire the note because the FDIC did not strike out the endorsement to SMS even though the FDIC had possession of and had paid for the note.[6]

The Defendants contend SMS is not the holder or owner of the note because the FDIC reacquired the note through the letter and check dated 1994 discussed above. The Defendants also assert that SMS judicially admitted the FDIC's reacquisition of the note in 1994 and the FDIC's status as holder and owner of the note in 1996 when SMS conceded the correctness of the district court's grant of summary judgment to ABCO.[7] The Defendants argue if the FDIC settled with ABCO in 1996 in a dispute concerning the note, then the FDIC must have owned the note in 1996. Finally, the Defendants

[5]The Plaintiff also relies on the affidavit of a loan specialist with the FDIC, Cynthia Wilkins, in which she opined that the FDIC has not reacquired or obtained delivery or possession of the note since the FDIC endorsed the note to the Plaintiff. Her affidavit conflicts with the evidence that the FDIC repurchased the note from SMS through the refund check and letter dated February 16, 1994.

[6]SMS's reliance on Tex. Bus. & Com. Code § 3.207 (Vernon Supp. 1999), which provides how a note is reacquired, is misplaced. The issue is not whether the FDIC reacquired the note, but whether SMS is the holder of the note therefore entitling it to enforce the instrument through this lawsuit.

[7]The district court held ABCO should be dismissed from this lawsuit due to its settlement with the FDIC in a 1996 lawsuit over the note.

4

claim the Plaintiff misstated the FDIC's position through Cynthia Wilkins' affidavit because her affidavit does not constitute the official position of the FDIC.

To recover on a promissory note, the plaintiff must prove: (1) the existence of the note in question; (2) that the party sued signed the note; (3) that the plaintiff is the owner or holder of the note; and (4) that a certain balance is due and owing on the note. Bean v. Bluebonnet Savings Bank FSB, 884 S.W.2d 520, 522 (Tex.App.--Dallas 1994, no writ). "'Negotiation' means a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder." Tex. Bus. & Com. Code § 3.201(a) (Vernon Supp. 1999). "[I]f an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder." Id. § 3.201(b). When an instrument is payable to an identifiable person, the "holder" is the person in possession if he is that identified person. See Tex. Bus. & Com. Code § 1.201(20) (Vernon Supp. 1999). When a holder indorses an instrument, whether the instrument is payable to an identified person or payable to bearer, and "the indorsement identifies a person to whom it makes the instrument payable," it is a "special indorsement". Tex. Bus & Com. Code § 3.205 (Vernon Supp. 1999). "When specially indorsed, *an instrument becomes payable to the identified person* and may be negotiated only by the indorsement of

5

that person." Id. (emphasis added). A "person entitled to enforce" an instrument includes the holder of an instrument. See Tex. Bus. & Com. Code § 3.301 (Vernon Supp. 1999).

The district court did not recognize the distinction between the status of holder and owner under the Uniform Commercial Code. The district court relied on an outdated version of the Texas Business and Commerce Code.[8] SMS is a holder of the note as defined in § 3.201 because it is in possession of a note which is payable to itself. SMS became a holder when the FDIC negotiated the note to it through the endorsement and delivery of the note in 1997. See Tex. Bus. & Com. Code § 3.201 (Vernon Supp. 1999). SMS is the holder of the note even if the FDIC's delivery of the note was inadvertent. As holder of the note, SMS is also a person entitled to enforce the instrument under § 3.301. See Tex. Bus. & Com. Code § 3.301 (Vernon Supp. 1999). Whether SMS is the owner of the note is a separate question which does not affect whether it is the holder of the note. Whether the FDIC reacquired the ownership of the note by refunding the purchase price of the note to SMS is

---

[8]The Texas Business and Commerce Code contains Texas' version of the U.C.C. This statute was amended in 1995 to conform to the Uniform Commercial Code. Prior to this amendment, the definition of "negotiate" did not include an involuntary transfer of an instrument, which is likely what occurred in this case. The effective date of this amendment was January 1, 1996. The Historical and Statutory Notes provide that the Act does not apply to a right accrued before its effective date. The Plaintiff obtained possession of the indorsed note from the FDIC in 1997. Therefore, the Plaintiff's right as a holder did not accrue until 1997, long after the effective date of the Act.

6

irrelevant to the issue of whether SMS is the holder of the note.

**B.  The Defendants' alternative grounds for summary judgment**.

The Defendants contend we could also affirm the district court's grant of their Motion For Summary Judgment on these alternative grounds: (1) equitable estoppel; (2) limitations; (3) commercially unreasonable disposition of collateral; and (4) no relation back of SMS's amended complaint.

**1.  Equitable Estoppel**

The Defendants argue the FDIC falsely represented to them during settlement negotiations in a 1996 lawsuit that it did not own the note and that they relied to their detriment on that false statement because they would have asked for a release from the note in the settlement had they known the truth.  The Plaintiff did not address the Defendants' promissory estoppel theory on appeal.[9]

We find a genuine issue of material fact exists concerning whether the FDIC falsely represented that it did not own the note in these negotiations.  See <u>Edwin M. Jones Oil Co. v. Pend Oreille Oil & Gas Co.</u>, 794 S.W.2d 442, 447(Tex.App.-Corpus Christi 1990, writ denied) (false representation is an element of the defense of estoppel).  The Defendants' argument that the FDIC's representation was false is apparently based on their belief that the FDIC

---

[9]In 1996, the FDIC and ABCO entered into a settlement agreement concerning a lawsuit brought by ABCO against AmWest alleging conversion and other causes of action inolving the wrongful seizure and sale of collateral ABCO gave to secure another note.

reacquired the note through the letter and refund check sent by the FDIC to SMS in 1994. SMS argued in its Response to Defendants' Motion for Summary Judgment that the FDIC's statement was not false because the FDIC sold the note to SMS in 1993. There is conflicting evidence in the record concerning the ownership of the note.[10] Because we find a genuine issue of material fact exists concerning this issue, we cannot affirm on this ground.

## 2. Limitations

The Defendants argue limitations also bars the Plaintiff's suit. The note matured on February 15, 1991. In April and May of 1991, Fairmont Park Lanes Bowling Center made two payments on the note. At that time, ABCO operated the bowling alley and owned the bowling alley's equipment but leased the land and building where the bowling alley was located from ADCO. On July 30, 1991, H. Eugene Abbott sent a letter to the FDIC requesting an extension of time on the note, offering a reduced monthly payment, and assuring that "they" anticipated "their" cash flow would soon increase enabling "them" to retire "their" debt with the FDIC. SMS sued on the note on April 9, 1997.

Both 28 U.S.C.A. § 2415(a) and 12 U.S.C.A. 1821(d)(14) on their face apply to this action. Section 2415 provides the limitations

---

[10]The Defendants introduced copies of the FDIC's 1994 letter and refund check. The Plaintiff introduced the affidavit of Cynthia Wilkins in which she averred that at no time since the FDIC indorsed the note to the Plaintiff has the FDIC reacquired or obtained delivery or possession of the note.

8

period for actions on contracts brought by the United States or its agencies. See 28 U.S.C.A. § 2415(a) (West 1994). Section 1821 was enacted as part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") and provides the limitations period for contractual claims held by the FDIC when appointed as a receiver or conservator of a failed bank. See 12 U.S.C.A. § 1821(d)(14) (West 1989 & West Supp. 1998). Both statutes provide a six year limitations period. However, § 2415 contains a tolling provision while § 1821 does not.[11]

Assignees of the FDIC, such as SMS, are entitled to the same six year period of limitations under § 2415(a) and § 1821(d)(14). See FDIC v. Bledsoe, 989 F.2d 805, 811 (5th Cir. 1993). Additionally, § 1821 applies to the FDIC's action even when the FDIC sues in its corporate capacity, rather than as a receiver or a conservator of a failed bank.[12] See 12 U.S.C.A. 1823(d)(3)(A) (West 1989)(giving FDIC, in its corporate capacity, the same rights, powers and privileges as FDIC acting as receiver); see also FDIC v. Bates, 838 F.Supp. 1216, 1217 (N.D. Ohio 1993); FDIC v. Thayer Ins. Agency, Inc., 780 F.Supp. 745, 749 (D. Kan. 1991); FDIC v. Howse,

---

[11]Section 2415(a)'s tolling provision provides that "in the event of later partial payment or written acknowledgment of debt, the right of action shall be deemed to accrue again at the time of each such payment or acknowledgment." 28 U.S.C.A. 2415(a) (West 1994).

[12]Because the FDIC was the original payee of the note, SMS is the assignee of the FDIC in its corporate capacity rather than the FDIC as a receiver or conservator of a failed bank.

736 F. Supp. 1437, 1445 (S.D. Tex. 1990).

If we determine that § 2415 applies, a genuine issue of material fact will exist concerning whether the Defendants tolled the statute of limitations period through the partial payments or the letter.[13]  If we determine that only § 1821 applies, the Plaintiff's case will be time barred, and we could affirm the district court's grant of summary judgment on this alternative ground.

**a. case law**

SMS relies on the only case addressing this issue, <u>Midstates Resources Corp. v. Farmers Aerial Spraying Service, Inc.</u>, 914 F.Supp. 1424, 1426-27 (N.D. Tex. 1996), in arguing that the two statutes should be construed together resulting in the tolling of § 1821's period.  SMS also argues the two payments from Fairmont Lanes tolled the period because the bowling alley was the Defendants' agent authorized to make payments on the loan.  SMS claims this agency relationship resulted from the Defendants' practice of making payments through the bowling alley throughout the life of the note.  Finally, SMS contends that H. Eugene Abbott's June 30, 1991 letter constituted an acknowledgment which was also sufficient to toll the limitations period.

---

[13]SMS alleged a payment made by one of the Defendants tolled the statute of limitation under §2415 for all of the Defendants because that Defendant was acting as an agent for the others.  If we determine that § 2415 applies, the fact issue will be whether the payments or the June 30, 1991 letter were made by an agent of the Defendants therefore tolling the limitations period for all.

The Defendants repeatedly mischaracterize cited cases, arguing that only § 1821 should apply, therefore time barring SMS's suit.[14] They argue that even assuming § 2415's tolling does apply, they did not toll the limitations period. The Defendants argue that no agency relationship existed between the bowling alley and the Defendants, and that H. Eugene Abbott clearly signed the June 30, 1991 letter to the FDIC as a representative of ABCO and not in his individual capacity.[15] Additionally, the Defendants argue that SMS cannot raise the agency theory for the first time on appeal.[16]

In Midstates, the court held § 2415's tolling provision should apply because it does not conflict with one of § 1821's provisions.[17] The court relied on Resolution Trust Corp. v. Seale, 13 F.3d 850, 854 (5th Cir. 1994) in stating that "section 1821 controls only when one of its specific statutory 'rules' conflicts with one of section 2415's general statutory rules." Midstates, 914

---

[14]The Defendants often attribute legal conclusions in their brief to cases which clearly did not decide the issue they claim it did. Their brief does more to obscure the issue than elucidate the correct course of the law in this area.

[15]Nothing in the letter evidences that H. Eugene Abbott signed it in his representative rather than individual capacity.

[16]SMS did not raise this issue for the first time on appeal. SMS alleged in its complaint that the partial payments and letter tolled the limitations period.

[17]In further support of its position, Midstates relied on cases which stated that § 1821 was meant to "clarify" the earlier law of § 2415. See Midstates, 914 F.Supp. at 1427 (citing Jackson v. Thweatt, 883 S.W.2d 171, 177 (Tex. 1994)); see also FDIC v. Schoenberger, 781 F. Supp. 1155, 1158 (E.D. La. 1992); see also FDIC v. Howse, 736 F.Supp. 1437, 1446 (S.D. Tex 1990).

11

F.Supp. at 1426. A closer examination reveals that Midstates misconstrued Seale.

Seale involved whether the later enacted § 1821 could revive claims previously barred by a state statute of limitations. After exploring the legislative history of § 1821, the court determined it should not revive the previously barred claims. In an effort to bolster its position, the court briefly addressed whether § 2415(b) revived the same claims. The court held that § 2415(b) did not revive the previously barred claims, but the court was indecisive concerning whether § 2415(b) should apply at all. The court first stated that "[a] general statutory rule usually does not govern if a more specific rule covers the case" and, therefore § 1821, as the more specific rule, should apply rather than § 2415(b).[18] Then the court noted that we gave effect to both § 2415 and § 1821 in FDIC v. Belli, 981 F.2d 838, 842 (5th Cir. 1993). Midstates used the first language to prove the opposite conclusion when it held that the tolling provision of § 2415(a), as the more specific rule, should prevail over the more general rule, i.e. no tolling provision, of § 1821.

In Belli, the court assumed both § 2415 and § 1821 applied to an action brought by the FDIC. Belli involved a suit by the FDIC on notes that were executed before Congress enacted FIRREA. First, the court decided that a cause of action "accrues" for the purposes

---

[18]This is the language Midstates relied on in applying the tolling provision of 2415(a).

12

of § 2415(a) when the debtor defaults and not when the FDIC acquires the right to sue on the note by being appointed receiver or conservator of the bank. See Belli, 981 F.2d at 840. After determining that the FDIC's suit was barred under § 2415(a), the court applied § 1821 retroactively to the action. Id. at 842. The court held § 1821 also barred the FDIC's suit because §2415(a)'s time period for the action expired before § 1821 became effective. Section 1821's time period does not revive claims that expired before its effective date. Id. In determining that § 1821 barred the FDIC's suit, the court assumed that both § 1821 and § 2415 applied.

## b. legislative history

Before the enactment of FIRREA, § 2415 governed the limitations period when the FDIC sued on a contract.[19] A split in the circuits developed concerning when a cause of action "accrued" under § 2415.[20] Congress resolved this split of authority by providing in

---

[19]See J. Michael Dorman & James E. Essig, Annotation, *Special Commentary: Limitation of Actions Under § 2(d)(14) of Federal Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) (12 U.S.C.A. § 1821(d)(14)) in Actions Brought by Federal Deposit Insurance Corporation as Receiver*, 126 A.L.R. Fed. 1 (1995)

[20]One line of cases held the cause of action accrued when the debtor defaulted. See FDIC v. Peterson, 770 F.2d 141 (10th Cir. 1985); see also FDIC v. Ashley, 754 F.Supp. 179 (D.C. Kan. 1990). Another line of cases held the cause of action accrued when the FDIC acquired the right to sue by being appointed receiver of the bank. See FDIC v. Former Officers & Directors of Metropolitan Bank, 884 F.2d 1304 (9th Cir. 1989); see also FDIC v. Hinkson, 848 F.2d 432 (3rd Cir. 1988).

FIRREA that a cause of action accrues either when the FDIC acquires the claim by assignment or receivership, or when the cause of action accrues under state law, whichever is later.  See 12 U.S.C.A. 1821(d)(14) (West 1989 & West Supp. 1998).

The little amount of legislative history concerning this section evidences Congress' intent to broaden the FDIC's powers. Congress' brief analysis in debate indicates it intended to extend the limitations period through this section.[21]  Additionally, one of Congress' stated purposes in enacting FIRREA was to "strengthen the enforcement powers of Federal regulators of depository institutions."   Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, 103 Stat. 183, 187. Applying the tolling provision of § 2415 in connection with § 1821 would fulfill Congress' stated goals in FIRREA.

Because we hold that § 2415's tolling provision should be

_____

[21]    Extending these limitations periods will significantly increase the amount of money that can be recovered by the Federal Government through litigation, and help ensure the accountability of the persons responsible for the massive losses the Government has suffered through the failures of insured institutions.   The provisions should be construed to maximize potential recoveries by the Federal Government by preserving to the greatest extent permissible by law claims that would otherwise have been lost due to the expiration of hitherto applicable limitations periods.

135 Cong. Rec. S10182-01 (1989)

construed with § 1821's limitations period, a genuine issue of material fact exists concerning whether the bowling alley's partial payments or H. Eugene Abbott's June 30, 1991 letter tolled the limitations period for all of the Defendants. As a result, we cannot affirm the district court's grant of summary judgment on this ground.

**3. Commercially unreasonable disposition of collateral; notice.**

The Defendants contend that we could also affirm the district court on the grounds that the FDIC did not provide the Defendants with sufficient notice of the lease of their collateral, the FDIC did not dispose of the Defendants' collateral in a commercially reasonable manner, and the FDIC violated Tex. Bus. & Com. Code § 9.504(c) by effectively selling the collateral to itself in a private sale. Because we hold the Defendants received adequate notice and genuine issues of material fact exist concerning the other grounds, the Defendants' arguments fail.

**a. Notice**

On July 17, 1991, the FDIC sent to each Defendant a notice of intent to foreclose on the collateral securing the note.[22] On December 17, 1991, the FDIC sent a second notice of intent to foreclose on the collateral to H. Eugene Abbott and ABCO. The FDIC leased the collateral to Amwest Savings on January 21, 1992, and

_____

[22]The collateral at issue is the bowling alley's equipment.

15

ultimately sold it to Amwest on September 3, 1992.[23]

When disposing of collateral securing a debt, a creditor must "give reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made." Tex. Bus. & Com. Code § 9.504(c) (Vernon 1991). "The purpose of this notification is to give the debtor an opportunity to discharge the debt, arrange for a friendly purchaser, or to oversee that it is conducted in a commercially reasonable manner." FDIC v. Lanier, 926 F.2d 462, 464 (5th Cir. 1991) (citing 2 J. White & R. Summers, Uniform Commercial Code § 27-12 at 598-99 (3d ed. 1988)).

The Defendants argue the two letters sent by the FDIC were insufficient notice because the first did not mention a lease, and the second letter, although mentioning the possibility of a lease, was sent only to H. Eugene Abbott and ABCO after the lease began.

The July 17, 1991 letter provided,

> [d]emand is made upon you to pay such indebtedness in full on or before the 16th day of August, 1991. In the event you do not pay this sum to the FDIC by such date, the FDIC will exercise its legal rights and remedies to collect such indebtedness, including, but not limited to, foreclosure of the Deed of Trust and sale of the property covered thereby in accordance with the terms of such Deed of Trust.

This letter notified the Defendants that the FDIC would dispose of

---

[23]Because Amwest had already foreclosed on the bowling alley building and land as a result of ADCO's default on another note, Amwest took possession of the collateral on December 3, 1991. The January 21, 1992 lease was retroactive to December 3, 1991.

their collateral if they did not pay by August 16, 1991. The letter was adequate to "inform reasonable business persons" that their property would be sold after that date. Siboney Corp. v. Chicago Pneumatic Tool Co., 572 S.W.2d 4, 6 (Tex. Civ. App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.). While the letter does not state whether the disposition will be by public or private sale, "the notice is not defective simply because it does not specifically state that the goods would be sold privately."[24] Lanier, 926 F.2d at 465; see Hall v. Crocker Equip. Leasing Inc., 737 S.W.2d 1, 3 (Tex. App.-Houston [14th Dist.] 1987, writ denied). Because the notice to the Defendants was adequate, we cannot affirm the district court's grant of summary judgment on this ground.

**b. commercially reasonable manner**

The Defendants also argue SMS should be precluded from obtaining a deficiency judgment because the FDIC did not dispose of the collateral in a commercially reasonable manner as required by § 9.504(c). They claim the FDIC's disposition was commercially unreasonable because the FDIC sold the collateral for a price substantially below its value, and the FDIC only offered to sell the collateral to one person.

Section 9.504(c) allows the disposition of collateral "as a unit or in parcels and at any time and place and on any terms", but

---

[24]Because the sale was ultimately private, the FDIC was only required to provide the date after which the collateral would be sold, rather than the time and place of any public sale. See Tex. Bus. & Com. Code § 9.504(c) (Vernon 1991).

17

"every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." Tex. Bus. & Com. Code § 9.504(c) (Vernon 1991). In Texas, the creditor must allege in his complaint either specifically that he disposed of the collateral in a commercially reasonable manner, or generally that he satisfied all conditions precedent to his right of recovery. See Greathouse v. Charter National Bank-Southwest, 851 S.W.2d 173, 176-77 (Tex. 1992). If pleaded generally, the creditor must prove that the disposition of the collateral was commercially reasonable only if the debtor specifically denies it in his answer. Id. at 177. If pleaded specifically, the creditor must prove the allegation to recover on the debt. Id. Here, SMS alleged generally that it satisfied all conditions precedent to its right to recover on the note, and the Defendants denied that allegation. Therefore, it was SMS's burden to produce evidence that the FDIC disposed of the collateral in a commercially reasonable manner.

SMS contends the sale was commercially reasonable because it sold the equipment for a reasonable price. The Defendants argue it was commercially unreasonable because the price was substantially below the equipment's actual value, and the FDIC only offered to sell the equipment to one person, Amwest.[25]

The price of the equipment is not dispositive of this issue.

_____

[25]The parties dispute whether various appraisals valued the bowling alley equipment in place or removed from the premises. The Defendants argue the value of the equipment in place was substantially higher than if removed.

Section 9.507(b) provides that "the fact that a better price could have been obtained by a sale at a different time or different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." Tex. Bus. & Com. Code § 9.507(b) (Vernon 1991). Section 9.507(b) also provides:

> [i]f the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

Tex. Bus. & Com. Code § 9.507(b) (Vernon 1991). Because there is no evidence that a "recognized market" exists for used bowling alley equipment, that part of the section is inapplicable. The answer turns on whether the FDIC sold the equipment in conformity with reasonable commercial practices amongst dealers of used bowling alley equipment.

The district court correctly found that a genuine issue of material fact existed concerning this issue, and we agree. While the Defendants assert that the FDIC made only one attempt to sell the equipment, the record reflects that at least one other inquiry was made to Don Tucker of Tulia, Texas.[26] The Defendants point to no other procedural irregularities in the sale indicating that it was conducted in a commercially unreasonable manner. Because a

---

[26]Don Tucker was described in the record as the "largest wholesaler of bowling equipment in the United States."

19

genuine issue of material fact exists concerning whether the FDIC disposed of the collateral in a commercially reasonable manner, this alternative ground for summary judgment fails.

## c. creditor as the buyer at a private sale

The Defendants also argue as an alternative ground that the FDIC violated § 9.504(c)'s prohibition against the creditor buying collateral at a private sale.[27] Section 9.504(c) provides that "[t]he secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at a private sale." Tex. Bus. & Com. Code § 9.504(c) (Vernon 1991).

The Defendants' argument rests on its conclusion that Amwest was the agent of the FDIC when the equipment was sold. They argue because Amwest was the FDIC's agent, the sale of the collateral to Amwest violated § 9.504(c).[28] The Defendants point to an "assistance agreement" between the FDIC and Amwest briefly mentioned in a settlement agreement between those parties and in the affidavit of H. Eugene Abbott. The Defendants neglected to include this agreement in the record, and did not explain the nature of this

---

[27]SMS did not address this argument in its brief.

[28]The district court recognized that there is no recognized market for bowling alley equipment and that the equipment is not the subject of widely distributed price quotations. Therefore, neither of the exceptions in § 9.504(c) allowing the creditor to buy collateral at a private operate in this instance.

20

agreement. Because there is insufficient evidence in the record supporting the existence of an agency relationship between the FDIC and Amwest, we cannot affirm the district court's grant of summary judgment on this ground.

**4. Relation back**

Finally, the Defendants argue we should affirm the district court's grant of summary judgment on the ground that the Plaintiff's amended complaint did not relate back to its original complaint. SMS's claim will be time barred if its amended complaint does not relate back, because the amendment occurred more than six years after any of the alleged tolling events occurred. Because we hold the Plaintiff's amended complaint relates back to the filing of the original, the Defendants' argument fails.

The Plaintiff mistakenly identified itself as SMS Financial II, L.L.C. in its original complaint. As a result, the Plaintiff amended its complaint with its correct name, SMS Financial, L.L.C. The complaints are identical with the exception of the deletion of a roman numeral.

Fed. R. Civ. P. 15(c)(3) allows an amended pleading to relate back when: (1) it changes the party or the naming of the party ; (2) the claim arose out of the conduct, transaction, or occurrence in the original pleading; (3) the party brought in by the amendment has received notice so that the party will not be prejudiced in maintaining a defense on the merits; and (4) the party knew or

21

should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party. Fed. R. Civ. P. 15(c)(3). While Rule 15(c) as written only applies to amendments adding defendants to an action, the Advisory Committee Notes for the 1966 Amendment to Rule 15 indicate that the rule also applies to amendments changing a plaintiff.[29] Additionally, we have consistently applied Rule 15(c) criteria to amendments changing plaintiffs. See Flores v. Cameron County, Texas, 92 F.3d 258, 272-73 (5th Cir. 1998); see also FDIC v. Conner, 20 F.3d 1376, 1385-86 (5th Cir. 1994).

SMS's amendment corrected an insignificant error in its name. The claim asserted in the amended complaint is identical to the original complaint, and the Defendants do not claim that they were prejudiced in any way. Because SMS's amended complaint relates back to the filing date of the original complaint, we cannot affirm the district court's grant of summary judgment on this ground.

---

[29] The relation back of amendments changing plaintiffs is not expressly treated in revised Rule 15(c) since the problem is generally easier. Again the chief consideration of policy is that of the statute of limitations, and the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs.

Fed. R. Civ. P. Rule 15(c) advisory committee's note, 1966 amendment.

**CONCLUSION**

For the foregoing reasons, we reverse the district court's grant of summary judgment and remand this case to the district court for further proceedings.

**REVERSED** AND **REMANDED**.