62 So.2d 599 (1952)
GIBBS
v.
HARTFORD ACCIDENT & INDEMNITY CO.
Supreme Court of Florida, Division A.
December 19, 1952.
Rehearing Denied February 5, 1953.
Turnbull & Pepper, Tallahassee, for appellant.
LeRoy Collins, of Ausley, Collins & Truett, Tallahassee, for appellee.
HOBSON, Justice.
Appellant, Robert Louis Gibbs, being desirous of building a home on a lot which he owned in Betton Hills, Tallahassee, Florida, entered into a contract with one Boyd L. Jones, Jr., a building contractor. Jones agreed, for a consideration of $27,000, to construct a dwelling house for Gibbs according to certain designated plans and specifications and Gibbs agreed to make payment to Jones for his services under the contract in the following manner:
"The owner shall make the payment of $1,500.00 upon the completion of the footings, foundation, and the brickwork to floor level, balance of the $27,000.00, that is the remaining $25,500, to be paid after the said house has been fully and completely constructed and has been approved and accepted by the owner and has been approved by the Federal Housing Authority and *600 upon closing of the loan to the owner; it being the intention of the parties that the contract shall be paid from the proceeds of the loan."
The contract between the owner and the contractor further provides:
"Article 10. Owner's Right To Terminate the contract should the Contractor neglect to prosecute the work properly, or fail to perform any provision of the contract, the Owner, after seven days' written notice to the Contractor, may without prejudice to any other remedy he may have, make good the deficiencies and may deduct the cost thereof from the payment then or thereafter due the Contractor or, at his option, may terminate the contract and take possession of all materials, tools, and appliances and finish the work by such means as he sees fit, and if the unpaid balance of the contract price exceeds the expense of finishing the work, such excess shall be paid to the contractor, but if such expense exceeds such unpaid balance, the Contractor shall pay the difference to the Owner."
Upon Gibbs' demand, Jones furnished appellant with a contract performance bond. Hartford Accident & Indemnity Company, appellee herein, is the compensated surety upon said bond. The bond expressly provides that the building contract is a part thereof by reference.
The obligation of said performance bond is,
"* * * if the Principal shall faithfully perform the contract on his part, and shall fully indemnify and save harmless the Obligee from all cost and damage which the Obligee may suffer by reason of failure so to do and shall fully reimburse and repay the Obligee all outlay and expense which the Obligee may incur in making good any such default, and shall pay all persons who have contracts directly with the Principal for labor or materials, then this obligation shall be null and void, otherwise it shall remain in full force and effect."
Within less than a month after Jones had started construction of the one-family dwelling he reported to Gibbs that he was unable to proceed with the construction unless he were given financial assistance, whereupon Gibbs secured a loan of $20,000 from the Lewis State Bank of Tallahassee and executed a mortgage in which he pledged the property, upon which construction of the dwelling house was in progress, as security for the repayment of said loan. Thereafter, as work progressed on the building disbursements were made by the Bank to Jones. The Bank made such investigation and inspection of the progress of construction as it deemed necessary for its own protection. Payments were made by the Bank at the following times and in the amounts stated:

 Feb. 11, 1950 $3,000.00
 Feb. 24, 1950 $2,000.00
 March 3, 1950 $4,500.00
 March 28, 1950 $1,500.00
 April 1, 1950 $3,000.00
 April 10, 1950 $1,000.00
 April 14, 1950 $3,000.00
 April 25, 1950 $1,937.00
 __________
 $19,937.00

Jones was paid by Gibbs $4,000 in addition to the above sums of money.
Subsequently, after Jones had failed properly to perform the contract and correct the work which allegedly was not properly done, Gibbs paid out $10,863 to laborers and materialmen who had liens against his home and then completed the construction of the building without the services of Jones.
Extras amounting to $1,428.25 were agreed upon by Jones and Gibbs after construction had been commenced and in accordance with the provisions of the construction contract. Before the owner took over and completed the construction he expended $23,937.20. It became necessary for the owner to pay out an additional $22,812 which made the total cost, in order to make the building conform with the contract, the sum of $46,749.20. Thus it may be seen that a loss was sustained either by appellant or appellee of $18,320.85.
*601 Appellant sued appellee and as a basis for such suit alleged that the principal (Jones) failed properly to perform the contract. Appellee defended upon the ground that appellant's failure to make payments as provided for in the construction contract and in making a new arrangement whereby he made prepayments departed so materially from the original contract as to completely relieve and discharge appellant as surety on the performance bond.
Defendant filed a motion for summary judgment. Affidavits were filed by both parties litigant. After a hearing upon the motion the learned Circuit Judge decided:
"This is an appropriate case for the determination of the issues on this defense by a motion for summary judgment because there is no material controversy over the facts, and the issue is primarily one of law."
He further determined that he should, and he did, enter a judgment in favor of appellee.
In a scholarly thesis the able Circuit Judge traced the history of the law, as it has been applied to sureties under circumstances similar to those in the instant case, from the early days of the common law down to the current period of modernity. It is true that under the common law a surety was considered to be a favorite of the law and even minor changes in, or departures from, the principal contract were held to discharge the surety. We need not dwell at length upon the rule of strictissimi juris because it has been discarded by most American Courts and certainly it is no longer applied in this jurisdiction. Moreover, counsel for appellee state in their brief, "We do not need or seek the shelter of a rule of strictissimi juris in the denial of liability * * *." It appears that the theory underlying this strict rule of construction was primarily the fact that in olden days a compensated surety was almost unknown. Consequently, the law was lenient toward and inclined to favor a surety who was an accommodation party.
However, along about the turn of the century, individuals, and later corporations formed for profit, began the business of becoming compensated sureties. Because of such mutation it became advisable, if not necessary, to change the philosophy of the law in order to keep pace with ever-changing conditions and thereby accomplish substantial justice.
There is a lack of unanimity of opinion, however, among the courts of today with reference to the question what conditions and circumstances attendant upon premature payment to the contractor will discharge the surety upon the latter's performance bond. Some courts hold to the out-moded view that a premature payment amounts under any and all circumstances to such departure from the contract as will operate to release and discharge the surety in toto. Such courts customarily reach this conclusion upon two premises: (1) that if payments are not made to the contractor in accordance with the terms of the construction contract the fund to which the surety would otherwise be entitled, should the contractor default, would be beyond reach and consequently lost to the surety to his injury; (2) that a construction contract which provides that the owner shall retain the funds in his hands until the contractor has fulfilled his obligations operates as an incentive to said contractor to complete and fulfill the contract in accordance with his obligations thereunder in order that he may receive these funds. It is likewise suggested that "The greater amount so retained the stronger the incentive." In this case the matter of withholding payment until completion of the work operating as an incentive may be disposed of readily. It cannot be said that the contractor could have had any incentive to complete this job since it is clear that because of lack of funds he could do no more than begin it.
There are courts which have modified the common-law rule by holding that if there is a material, possibly substantial, departure from the construction contract the surety will be wholly exonerated. Other courts, which we believe enunciate the rule compatible with substantial justice, hold that prepayments such as the record shows were made in this case do not discharge a compensated surety except in those instances where it may appear that *602 such departure from the terms of the construction contract resulted in injury or prejudice to the surety, and then only to the extent of such injury.
It is more than difficult for us to understand why a compensated surety should be discharged from the obligation of the performance bond if in fact said surety has sustained no injury as the result of premature payments to the contractor. Nor can we see wherein the surety is injured or prejudiced if, as was established by the affidavit of the contractor, Jones, all of the money advanced by Gibbs was actually used in the construction of the subject house. Of course, appellant at the trial should be required to prove not only that all of the money went into the construction of the house but that the house was constructed in accordance with the original plans and specifications, except, of course, changes made as permitted by the contract. Moreover, the burden should be placed upon him to show that the cost of materials and the charges for labor were the usual, customary and prevailing, costs of materials and wages for labor during the period of construction.
It was the conclusion of the Circuit Judge that,
"When, as here, it appears that the contractor was in distress almost at the beginning of the contract; that he was able to continue work only because of the premature payments made by the owner, but the work was not properly done or the job completed in accordance with the contract, resulting in a very heavy loss to someone, and there is no practical way to determine with any degree of accuracy what course the surety would have pursued had it been given notice of the situation, or what the result of that course would have been, under such circumstance damage to the surety will be presumed and the owner will not be heard to try to show that no loss was suffered by the surety.
* * * * * *
"Had the surety taken over the contract when the contractor announced his inability to proceed on his own resources it might have done no better. But this is a matter of conjecture. Under the circumstances above outlined it had the right to try before any more of the contract funds in the hands of the owner were turned over to the contractor. It does not necessarily follow, however, that the surety is completely exonerated from all liability as contended by the defendant. Had the contractor borrowed this amount of money from another source, had he inherited it, or received it as a gift from the plaintiff or anyone else, he would have had the right to proceed to attempt to perform his contract and the liability of the surety would not have been in any way diminished. The surety was not wronged by the contractor receiving the money. The only act injurious to the surety was the attempt to charge these payments against the contract price. This the owner had no right to do. These payments must be disallowed as credits upon the obligation of the plaintiff to pay for the construction."
The trial judge likewise made the following statements which we consider epitomize his reasoning:
"A surety might readily bond a job when no payment is to be made until the work is finished and refuse to bond a similar job to be performed by the same contractor when the entire purchase price is paid before work begins. Between these extremes the surety has right to bond or refuse to bond a contract. And it also has the right to expect the owner to make payments only in accordance with the contract."
We do not fail to recognize the force of his logic. However, we are impelled toward a contrary view.
Although we have never directly passed upon the question presented on this appeal, we find that this Court at least envisaged it in the case of Standard Accident Insurance Co. v. Bear, 134 Fla. 523, 184 So. 97, 103, 127 A.L.R. 1. In that case we said:
"This distinguishes the present case from those cases where the work was *603 still progressing and the contractor needed the money to carry on, or the contractor defaulted and the owner had to complete the work, or where the surety consented to the payment." (Italics supplied.)
Under the construction contract of which appellee had notice Gibbs had the right in the event the contractor neglected "to prosecute the work properly" or failed "to perform any provision of the contract" to "make good the deficiencies" and to "deduct the cost thereof from the payment then or thereafter due the Contractor." As we understand the facts of this case, that was, in effect, exactly what Gibbs did. It is true that he continued to use the services of Jones, at least for a time, but there was nothing in the contract which prevented him from doing so. Furthermore, the condition of the performance bond was to the effect that if Jones should fail to faithfully perform the contract and fully indemnify and save harmless the obligee (Gibbs) from all costs and damage which he might suffer by reason of such failure "and shall fully reimburse and repay the Obligee all outlay and expense which the Obligee may incur in making good any such default, and shall pay all persons who have contracts directly with the Principal [Jones] for labor or materials, then this obligation shall be null and void, otherwise it shall remain in full force and effect."
So it is that appellee recognized the right of Gibbs to incur expense in making good the default on Jones' part. Why then should appellee complain or be discharged from liability simply because it was denied the right to elect what course it would have pursued had it been given notice at the time of Jones' voluntary admission that he would be required to default because of lack of financial ability to continue? The loss to the appellee would have been the same had it been notified whatever course it might have pursued unless appellee upon the trial should prove otherwise or unless appellant should fail to establish the fact that all of the money which he paid to Jones went into materials and labor on this particular job and that the costs and expenses thereof were the usual, customary and prevailing costs and expenses during and at the time the work was in progress. If appellant should fail at a trial of this case to carry the burden of proof, then, and to the extent of such failure, injury to appellee would be shown as a matter of fact rather than assumed as a presumption of law.
We quote with approval from the case of Maryland Casualty Co. v. Eagle River Union Free High School Dist. of Vilas County, 188 Wis. 520, 205 N.W. 926, 928:
"It would seem, too, that not every circumstance prejudicial to the interests of the surety should work a total discharge of the surety, without any reference or consideration to the extent to which the interests of the surety were in fact prejudiced by such circumstance. In other words, a paid surety should not suffer damage by breach of any duty or obligation resting upon the indemnified; but neither should the surety be permitted to profit thereby. If the breach on the part of the indemnified results in damage to the surety, the surety should be compensated for such damage, but no further." (Italics supplied.)
We further quote from the case of Maryland Casualty Co. v. Eagle River Union Free High School Dist. of Vilas County, supra, and adopt as the law of this State the following:
"The number of cases coming to the courts, in which paid sureties are urging their complete discharge by reason of some infraction of the contract on the part of the indemnified, suggests that a more specific rule concerning their rights and liabilities be stated. It is believed that rule will be easy to discover, if such contracts be consistently treated (as they have often been declared to be) as insurance contracts rather than the common-law surety contract. It is true that such contracts retain the form of surety contracts. But the principles governing the liability of sureties did not spring from the form of the contract, but rather from *604 the relations of the parties to such contracts, and a striking change in that relation exists where the obligation of the surety, once gratuitously assumed, is now assumed as a source of profit. While the contract between the parties should govern their rights and liabilities, such contract should no longer be construed strictly in favor of the surety. This has often been declared. * * *
"There can be no injustice in requiring a paid surety, when in the business for profit, to prove that alleged delinquencies or misconduct on the part of the indemnified resulted, not only in damage to the surety, but the extent of such damage. That is nothing more nor less than a rule applied with reference to contracts generally, except perhaps cases where the breach of a contract is so material as to justify the other party in rescinding the contract. We must not be understood as saying that there can be no conduct on the part of the indemnified which will result in the absolute discharge of the paid surety; but we say that, as a general proposition, considerations of justice are fully met when the surety is recouped to the extent of the losses actually sustained by reason of misconduct on the part of the indemnified." See also School District No. 3 of Ford County v. United States Fidelity & Guaranty Co., 96 Kan. 499, 152 P. 668.
As we have previously observed, the authorities upon the question presented by this appeal are divided into three groups. The view expressed by one group is the strict rule which comes down from the old common law to the effect that even a minor or slight departure from the terms of the construction contract will relieve and discharge the surety from liability. Another of these groups is of the opinion that if there be a material departure from the construction contract the surety should be completely relieved and exonerated. The third group expresses the view to which we now commit this Court, that is to say, that if the departure from the construction contract results in injury to the surety then ipso facto such departure must be classified as material but the surety should be relieved and discharged only to the extent of the injury.
It follows that our judgment should be and is one of reversal.
Reversed.
SEBRING, C.J., and TERRELL and THOMAS, JJ., concur.