UNITED STATES of America, Plaintiff-Appellant,

v.

CONTINENTAL CASUALTY COMPANY, Defendant-Appellee.

No. 74–1896.

United States Court of Appeals, Fifth Circuit.

May 5, 1975.

Rehearing Denied June 3, 1975.

Robert W. Rust, U. S. Atty., Mervyn L. Ames, Asst. U. S. Atty., Miami, Fla., Leonard Schaitman, Michael Kimmel, Attys., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Wesley G. Carey, Steven R. Berger, Miami, Fla., for defendant-appellee.

Before DYER, MORGAN and GEE, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This case arises, somewhat tangentially, from a contract awarded on June 6, 1966, by the United States Army Corps of Engineers to Mike Bradford & Co., Inc. (hereafter "Bradford") and Southern Crane Corp., Inc., as a joint venture, in the amount of $273,645.00 for production of eleven hoists to be used in a lock and dam project on the Arkansas River. The joint venture immediately obtained a

performance bond for $136,822.50 from appellee Continental Casualty Company (hereafter "Continental"), a corporate surety. On August 16, Bradford subcontracted with McNally Pittsburgh Manufacturing Corporation (hereafter "McNally") for fabrication of some of the equipment.

As provided by contract, McNally furnished progress reports known as "work estimates" to Bradford, which forwarded them to the government; the government paid Bradford which was in turn obliged to pay McNally. As of August 30, 1967, four payments totalling $159,872.13 had been made to Bradford; unfortunately, none of this money had been forwarded to McNally, even though that company had by then completed 66% of the fabrication. Suspecting finally that all was not as it should be, McNally notified the government on December 27, 1967, that it had not yet received payment from Bradford. In an attempt to improve what appeared to be a precarious position, McNally subsequently declared a lien on the partially completed equipment, all of which was still in its plant; the government denied the validity of the lien.

In early March, 1968, Bradford notified the government and Continental that it was financially unable to continue the project. On March 15, the government informed Bradford and Continental that the contract was terminated for default; in the same letter the government stated that McNally was still obligated to deliver the completed equipment and that all of the equipment covered by the progress payments to Bradford were the property of the United States. McNally, as noted, disagreed with this analysis, and asserted that its alleged lien took precedence over any government claim. At this point, the government took the action which has since become the focal point of this litigation: on May 27, 1968, it granted a reprocurement contract to McNally for $291,000.00 for purchase of the hoists. The contract thus ignored the $159,872.13 in payments already made to Bradford for purchase of the same equipment. On June 5, 1968, the government demanded payment from Continental of $177,227.13 (the second payment of $159,872.13 plus $17,355.00 in reprocurement costs) and on October 13, 1972, it filed suit in federal district court to enforce its claim. On cross motions for summary judgment, the court ruled in favor of Continental as to any liability in excess of the government's reprocurement costs. The court held that the government's second payment to McNally for the 66% of the equipment for which Bradford had already been paid prejudiced Continental's right of subrogation against McNally and therefore released it pro tanto from its obligation to the government. For reasons explained below, we affirm the judgment of the district court.

Ordinarily in a case such as this one, we would initially determine whether state or federal law controls our disposition of the substantive issue. Since the suit was brought in Florida, and the surety bond was made there, and Florida generally applies a lex loci contractu analysis,[1] our choice would be between federal and Florida law. Since we find that there is no difference between the provisions of these two bodies of law in this area, however, we need not decide the choice of law question, but may proceed directly to the substantive problem.

▮ It may be helpful to clarify at the outset precisely what is at issue here. The government insists that the right to subrogation does not accrue in favor of a surety until the surety has performed its contractual obligation, a precondition which Continental clearly did not fulfill. This proposition is true, but it is only a starting point for our analysis of this case; we must decide which party should bear the loss when the government in effect *prevents* the surety from performing its obligation, thereby negating any possibility of subrogation.

▮ As a creation of equity, subrogation is governed generally by broad

---

1. Confederation Life Association v. Vega y Arminan, 207 So.2d 33 (Fla.1968).

equitable principles rather than by strict legal rules. New York Title and Mortgage Co. v. First National Bank of Kansas City, Mo., 51 F.2d 485 (8th Cir. 1931), cert. denied 284 U.S. 676, 52 S.Ct. 131, 76 L.Ed. 572 (1931); Dantzler Lumber and Export Co. v. Columbia Casualty Co., 115 Fla. 541, 156 So. 116 (1934). Therefore, where one of two relatively innocent parties must suffer a loss, the one whose action causes the loss must bear it. Gray v. Jacobsen, 56 App.D.C. 353, 13 F.2d 959 (1926). Further, a surety is entitled to be subrogated to the benefit of all securities and means of payment under the creditor's control, and any act by the creditor depriving the surety of this right discharges it pro tanto; thus, the creditor must, for the surety's benefit, apply to the debt all money or security within his control and which he has a right to apply. If he voluntarily surrenders or releases such security, the surety is discharged pro tanto. See Standard Accident Insurance Co. v. Bear, 134 Fla. 523, 184 So. 97 (1938). Of course, the creditor will not always be able to prevent loss to the surety; nevertheless, it must act in good faith and not unreasonably prejudice the surety's right to subrogation. See United States v. United States Fidelity and Guaranty Co., 236 U.S. 512, 35 S.Ct. 298, 59 L.Ed. 696 (1914); Cf. Gibbs v. Hartford Accident and Indemnity Co., 62 So.2d 599 (Fla. 1952).

Applying these broad maxims is of course more difficult than stating them in the abstract. The factual situation in early 1968, and its legal ramifications, were obviously unsettled. The government had paid out more than $159,000.00 for equipment to which it therefore had a valid claim under the terms of the contract.[2] On the other hand, McNally was contending that it had a valid lien on the equipment and that such lien had "attached as soon as the work and material was furnished . . . prior to the passing of any title to the Corps of Engi-

neers." Clearly, resolving this contest in commercial metaphysics would have taken some time and could have delayed completion of the dam and lock.

As noted above, the government chose to extricate itself from this dilemma by simply abandoning its claim to title in the equipment and paying for it a second time. As the district court summarized:

> The one problem with this arrangement . . . is that by reletting the contract in this fashion [the Corps] not only obligated the surety to pay the full amount of the bond, but concurrently destroyed its right to be subrogated to the title the Corps held in the hoists at the time of reprocurement. The surety could not now proceed against McNally to replevy the partially completed—and partially paid for—hoists.

\*     \*     \*     \*     \*     \*

The surety had to be given some way to protect its right to be subrogated to the title of the Corps in the hoists at the date of termination, and the [reprocurement contract] effectively destroyed that right.

Additionally, and crucially, the government could have protected Continental's right without impairing its own interest in speedy completion of the project. It could have initiated litigation against McNally to determine title to the 66% of the hoists for which it had already paid, while at the same time paying into court $159,872.13. While the suit was in progress, it could then have entered into the reprocurement contract with McNally, and demanded payment of the bond by Continental. After paying the bond, Continental would have been subrogated to any right the Corps was eventually determined to have had in the partially completed equipment.

█ Balancing the equities of the two parties, then, we find that the scales tip in favor of the surety. The govern-

---

**2.** Clause SC-7 of the contract between Bradford and the government provided that, upon payment to Bradford for the work estimates submitted, " . . . title to all equipment, parts, articles and materials and work progress included in such estimates of work performed shall forthwith vest in the Government. . . ."

ment has great discretion in the administration of its contracts, and its interest in their timely completion is entitled to great weight. Argonaut Insurance Company v. United States, 434 F.2d 1362, 193 Ct.Cl. 483 (1970). Here, however, the government could have protected this interest without destroying the surety's extremely valuable subrogation right; its action here constituted an abuse of discretion, and released the surety pro tanto.

The judgment of the district court is therefore affirmed.