**Harry K. SEWARD and Rita Seward, Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Defendant.**

**No. CIV.A. 2:99CV311PG.**

United States District Court,
S.D. Mississippi,
Hattiesburg Division.

Oct. 18, 2002.

Lawrence C. Gunn, Jr., L. Clark Hicks, Jr., John M. Herke, Hattiesburg, MS, for Harry K. Seward, Rita A. Seward, plaintiffs.

David N. Usry, U.S. Attorney's Office, Jackson, MS, for United States Department of Agriculture, defendant.

## MEMORANDUM OPINION AND ORDER

PICKERING, District Judge.

This case is before the Court on a Petition for Judicial Review of an Administrative Agency action. The Petition challenges two decisions of the United States Department of Agriculture, National Appeals Division (USDA, NAD) dated October 29, 1999, and June 19, 1998.

### FACTUAL BACKGROUND

On or about April 18, 1979, the United States Department of Agriculture through the Farmers Home Administration (FmHA) closed a farm loan to Enshallah Ranch, which was a partnership between Harry Seward and Dickie Joe Ladner. The original principal amount of the loan was $250,000. Additional signatories to the note were Seward's wife, Rita A. Seward, and Ladner's wife, Glenda J. Ladner. All of the co-borrowers personally guaranteed the farm loan to Enshallah Ranch.

The security for the note was 302 acres of land located in Pearl River County, Mississippi, which was part of a larger purchase of some 2,015 acres by Enshallah Ranch.[1] The Seward/Ladner partnership farmed this and other land until on or about January 31, 1981, when Harry Seward and Dickie Joe Ladner executed an agreement dissolving their partnership.[2] This dissolution agreement provided that

---

1. FmHA held a first priority lien on the 302 acre tract securing the Enshallah note at issue. The Federal Land Bank had a second priority lien on this 302 acres and a first priority lien on the bulk of the land purchase.

2. The partnership ran into difficulties during June 1980 when the partnership was operating at a loss and Seward was unable to continue to put personal funds into it. The parties entered an initial dissolution agreement on June 5, 1980, which provided a savings clause for the partnership in the event advancements made to the partnership by Ladner, individually, were repaid by November 17, 1980, by the partnership and/or Seward. These payments were evidently not made and the partnership was ultimately dissolved in January 1981. (R.1998S000087 at 101–106)

Ladner would assume the FmHA note and be responsible for all other outstanding debts of the partnership and to indemnify and hold Seward harmless for all debts and liabilities of the partnership and to attempt to secure the release of Seward from all debts and liabilities of the partnership. (R.1998S000087 at 109) [3]

On or about March 18, 1981, Ladner wrote to the local office of the Farmers Home Administration requesting a partial release to allow him to sell some of his land. He notified the agency at that time that he had purchased Mr. and Mrs. Harry K. Seward's part of the ranch and requested they be released from any obligations or further responsibilities on the original 1979 note. (R.87 at 116–117) FmHA sent a letter to Ladner on April 1, 1981, denying the request for the release of the Sewards. (R.9630 at 39) It is undisputed that no such notice was ever sent to the Sewards.

Separately from the Enshallah note, the petitioners executed five additional notes with the Farmers Home Administration on September 28, 1979, on June 11, 1981, (three notes), and on September 4, 1981. These were to finance the Sewards' farming operations separate and apart from the partnership with Dickie Joe Ladner.

Some years after entering into these notes and as a result of the downturn in American agriculture, the Sewards ran into financial difficulties in their farming operations and became delinquent in their obligations to FmHA. On February 19, 1986, the Sewards received a letter from the National Administrator of the Farmers Home Administration, Vance Clark, which notified the Sewards that they were seriously delinquent in their loans and provided a packet of information concerning alternative servicing options available to them through the Farmers Home Administration. (R.87 at 72)

As a result of communications and correspondence with FmHA subsequent to the receipt of this information and pursuant to a request from them, the Sewards received a letter from Alan Wood, the county supervisor for FmHA, Jackson County, Mississippi, detailing all of the notes owed by the Sewards to Farmers Home Administration. (R.87 at 74) This letter from the FmHA omitted the 1979 note executed on behalf of Enshallah Ranch, but included all of the notes signed by the Sewards after the 1979 Enshallah note.

Thereafter, the Sewards began negotiating with FmHA on a loan servicing option referred to as a Net Recovery Buyout/Recapture Agreement. This program allowed the Sewards to write down their total debt to the Farmers Home Administration to a calculated net recovery value of the security. It also contained a recapture provision which allowed FmHA to recover the actual fair market value of the property in the event the security was liquidated or transferred within two years of the agreement for an amount greater than the calculated net recovery value.[4]

The Net Recovery Buyout Agreement was entered on May 31, 1994.[5] (R.87 at

---

The January 31 dissolution therefore was actually an amendment to the original Partnership Agreement as well as a dissolution thereof (R.1998S000087 at 107–110)

3. The record in case number 1998S000087 will be referred to hereafter as R.87 and in 1998S009630 as R.9630.

4. The fair market value of the Sewards' property was calculated by FmHA to be approxi-

mately $84,333 more than the net recovery value of the security. R.87 at 99.

5. The agreement was not consummated until 1994 even though the delinquent servicing notice was provided in 1986 because of a liquidation/foreclosure moratorium imposed against FmHA by the Federal Courts.

99) At that time, the Sewards had a loan balance of $2,341,119.08. The net recovery value of the security on the loans was calculated to be $159,667.00. The Sewards secured financing for this amount from another source and the two million dollar plus loan balance was written off subject to the two year recapture agreement.

Prior to entering into the Net Recovery Buyout/Recapture Agreement on May 31, 1994, the Sewards had worked with their county supervisor in determining the amount of all loans they owed to FmHA. On September 13, 1993, the county supervisor signed off on the net recovery buyout/recapture checklist. The state director signed off on the checklist on October 20, 1993. (R.87 at 75–77) The checklist provided, among other things, that the Farmers Home Administration had "current, properly completed real estate and/or chattel appraisals on *all* FmHA security." *Id.* (Emphasis added). It provided further "*all* debts and collateral have been verified and correctly entered on the FHP;" and "the correct ... unpaid principal and interest figures for *all* FmHA debts were entered into DALR$."[6] *Id.* (Emphasis added). And further, "prior liens and amounts of prior liens have been verified and correctly entered into DALR$." *Id.* None of the analysis conducted by the county supervisor and the state director included the 1979 Enshallah note.

The deed of trust and note taken to protect the recapture agreement were duly canceled after the expiration of two years. The Sewards had no further contact with the United States Department of Agriculture, Farmers Home Administration until on or about September 29, 1997, when the Sewards received a notice of availability of loan servicing regarding the 1979 Enshallah note.[7] The government admits that there was no contact with the Sewards regarding the Enshallah note for some sixteen years from 1981 until the notice issued in 1997. (R.87 at118)

On August 1, 1997, new administrative procedures became available to FSA which allowed them to offset for delinquent accounts that had not been previously accelerated. 7 C.F.R. § 1951. The 1997 notice provided that the Sewards were subject to this administrative offset for loan number 43–02 dated April 18, 1979. This was the original Enshallah note.[8] The 1997 notice indicated that there was approximately $144,000 owing on this note.

The government contends that this note was never accelerated and was therefore subject to the new offset regulations. Based on the record, the government's argument in this regard is not persuasive.

Ladner, as the sole partner in Enshallah, filed a voluntary Chapter 11 bankruptcy petition on October 5, 1984. A Chapter 11 plan of reorganization was approved on

6. "DALR$" was an acronym for the program that FmHA used to analyze the financial position of borrowers in reaching decisions regarding loan servicing.

7. In the meantime the name of the United States Department of Agriculture, Farmers Home Administration had been changed to the Farm Service Agency (FSA). Hereafter, FmHA will be referred to as FSA, USDA or the government.

8. The Court would note that in the Net Recovery Buyout/Recapture Agreement note number 43–02 was one of the notes covered. It has not been argued and the Court has not been able to determine that the 43–02 note referenced in the Agreement was the same note numbered 43–02 referred to in the September 1997 letter. The Court notes that the original Enshallah note was for the principal balance of $250,000. The records appear to indicate that the 43–02 note that was covered by the Net Recovery Buyout Agreement was for an original principal amount of $300,000 and was executed in 1981.

April 19, 1985, providing for debtor payments to FmHA. Ladner made no payments to FmHA after 1988 which was for the 1984 payment. On August 25, 1989, FSA sent a notice of serious delinquency on the Enshallah indebtedness to Lawrence Gunn, as the attorney for Enshallah, then owned solely by Ladner, offering loan servicing options. When an incomplete servicing option package was returned by Ladner, FSA sent a Notice of Intent to Accelerate the Enshallah debt to Mr. Gunn as Ladner's attorney. (R.9630 at 114) This letter is referred to in a June 1991 brief of the government in Ladner's bankruptcy which states that Ladner was "advised of acceleration in February of 1990," (R.9630 at 296), and is appended thereto as Exhibit D. (R.9630 at 311) The Sewards were not notified prior to 1997 that the Enshallah note was delinquent, nor were they provided with the Notice of Intent to Accelerate.

When FSA attempted to offset against farm program payments due Seward Farms for the Enshallah note in 1997, the Sewards appealed to the National Appeals Division of the USDA in Case No.1998S000087 asserting, (1) that the statute of limitations on the note had expired; (2) the debt settlement in 1994 had compromised the Enshallah note; (3) that Ladner had purchased the Sewards' interest in the real estate and was therefore the sole obligor on the original note; and (4) that the Agency had failed to give proper delinquency notice as to the administrative offset. On May 7, 1998, the hearing officer, after conducting an evidentiary hearing, entered her determination agreeing with the positions set forth by the Sewards. (R.87 at 5–10) Specifically, the Hearing Officer found that the "Agency denied the request to release Harry K. Seward from liability for no cause." (R.87 at 8) She also found that the Agency allowed Ladner to sell the Enshallah security "free and clear" of the FSA debt and that "[f]rom 1981 to 1997 the Agency treat-ed the Enshallah Ranch account not the [Sewards'] debt." *Id.* She further found that the "Agency abandoned the Enshallah Ranch loan when it entered into the Net Recovery Buyout Agreement" with the Sewards in 1994. *Id.* The Agency requested a review by the Director, who on June 9, 1998, agreed with the Hearing Officer on point four of the Sewards' argument, i.e., that the Agency's notice to the Sewards to impose an administrative offset did not meet regulatory requirements. The Director's review did not address the other findings of the Hearing Officer. (R.87 at 2–4)

On August 24, 1998, the FSA again notified the Sewards of their intent to administratively offset for the debt on the Enshallah note. The Sewards appealed in Case No.1998S009630 on September 9, 1998, asserting six reasons; (1) They had not received their 1997 payment refund pursuant to the June 19, 1998, decision; (2) the statute of limitations barred the collection of the Enshallah note; (3) FSA did not follow its own internal regulations dealing with administrative offsets; (4) FSA had released the debt by its prior actions; (5) the Net Recovery Buyout Agreement effected a compromise and satisfaction of any indebtedness the Sewards may have owed to FSA; and (6) the notice provided by the August 19, 1998, letter was not timely.

The NAD Hearing Officer, who was the same Hearing Officer who had heard the first appeal, issued a jurisdictional determination dated January 21, 1999, finding, based on collateral estoppel concepts, that the Agency was bound by the previous Director's determination and therefore the Sewards' appeal was not within the jurisdiction of the NAD. (R.9630 at 93–97) She specifically found that the exact factual issues had been decided in favor of the Sewards and upheld by the previous Director review in 1998S000087. The Se-

wards, feeling aggrieved because FSA asserted its continued right to offset against program payments, appealed this decision claiming that the NAD did have jurisdiction for a determination of the issues.

The Director vacated the jurisdictional determination of the first Hearing Officer and remanded the matter to a different Hearing Officer for a hearing. On July 22, 1999, the second Hearing Officer made findings of fact that the Enshallah note was enforceable and that there was no legal impediment to the administrative offset sought by the FSA. (R.9630 at 403–410) The Sewards filed a request for Director review.

The Assistant Director issued her determination on October 29, 1999. (R.9630 at 411–414) She found that the Sewards were co-borrowers on the Enshallah note and remained liable for the delinquent debt. She also determined that the notice was proper and that collection of the debt was not barred by any applicable statute of limitations. However, she determined, on an issue not raised by the Sewards or by their attorney in the appeal process, that 7 C.F.R. Part 3–B did not permit the offset of one entity's payments to collect another entity's debts. She specifically found that the Agency had erred in offsetting funds earned by Seward Farms to pay on delinquent debt owed by Harry K. and Rita A. Seward as individuals.

Based on this determination, *the government originally agreed, in this litigation,* that unless the petitioners changed their farming entity from Seward Farms and began to farm as individuals, *an administrative offset would never be available to collect the Enshallah note from the Sewards.* However, on August 21, 2000, new regulations went into effect which allowed an administrative offset against any entity in which a debtor participates based on his pro-rata interest in the entity. The Sewards own a one-half interest in Seward Farms, a family partnership operated in conjunction with their son. During the pendency of this action, based on this new regulation, FSA offset approximately $174,401.36 against program payments due the Sewards and applied it toward the indebtedness of the original Enshallah note.

## PROCEDURAL HISTORY

The Petition for Review of the Administrative Decisions was filed on November 10, 1999. On January 20, 2000, petitioners filed a motion to amend the petition to assert a claim for attorney fees and expenses under the Equal Access to Justice Act (EAJA) after the same was denied by the NAD. The United States thereafter filed a Motion for Summary Judgment and a Motion to Stay. The petitioners filed a response and opposition to the motion and filed a Cross–Motion for Summary Judgment. The Motion to Stay was granted pending a decision on the summary judgment motions. The Court conducted oral argument on these motions on June 27, 2002.

The government first contended that the court did not have jurisdiction to hear this matter because the Sewards had failed to exhaust all administrative remedies available to them regarding the subsequent offsets or otherwise lacked standing because the two administrative decisions were favorable to them. However, during oral argument the government conceded that because the NAD Assistant Director found the Enshallah note enforceable in her October 1999 ruling, the court properly has jurisdiction to review that decision.[9]

---

9. The Government ultimately conceded standing as "[t]his inquiry places not too heavy a burden on a prospective plaintiff because even a "probabilistic benefit from winning the suit is enough 'injury in fact' to confer standing" under the Constitution." *Sabine River Authority v. U.S. Dept. of Interior,* 951 F.2d 669, 674 (5th Cir.1992)(*quoting North Shore*

A question was raised as to whether this Court has jurisdiction over the subsequent offset which took place in 2000, and after the 1999 decision. If the Court determines the note is enforceable, then those offsets were proper, subject only to proper administrative procedures having been followed by FSA. Counsel for petitioner agrees.[10] However, if the Court determines that the 1979 Enshallah note is not enforceable, then those offsets were improperly applied to program payments due the Sewards. The government conceded at oral argument that if the Court finds the 1979 note unenforceable, subject to appeal of such decision, the government will refund the offsets.

The parties further agreed at oral argument that there are three issues on the enforceability of the note to be decided by the Court. Those issues are; (1) whether the statute of limitations ran on enforcement of the 1979 Enshallah note; (2) whether FSA is estopped from enforcing that note against the Sewards; and (3) whether there was an accord and satisfaction of the note.

The Sewards argue (1) that two separate statutes of limitation bar the governments's claims; (2) the government is estopped from collecting the note from the Sewards because of its actions in failing to notify the Sewards of the delinquency of the note from 1981 until 1997 and in improperly and wrongfully releasing the security for the note; and (3) the 1994 Net Recovery Buyout Agreement between the Sewards and USDA, FmHA ended the Sewards' obligations under the 1979 note. Additionally, under their EAJA petition,

they claim entitlement to attorney fees and expenses for the administrative and judicial processes. This matter being ripe for decision, the Court will address each of these issues.

## STANDARD OF REVIEW

Each of the parties has moved for summary judgment based upon the administrative record before the court. The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■■■■ The court is required to base its decision on the administrative record developed below in this petition for review pursuant to the dictates of the Administrative Procedures Act (APA). 5 U.S.C. § 706(2)(E, F). It may not be based on a new record developed in this court. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The proper standard by which the court must review the actions of the Agency is whether it acted arbitrarily, capriciously or contrary to the law in making its decisions. *Id. See also, Texas v. EPA*, 499 F.2d 289, 296 (5th Cir.1974); and 5 U.S.C. § 706(2)(A). The Court finds the FSA acted "contrary to the law."

---

*Gas v. EPA*, 930 F.2d 1239, 1242 (7th Cir. 1991)). Further, "the challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Super Tire Engineering Co. v. McCorkle,*

416 U.S. 115, 122, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974).

**10.** The petitioners admit that the administrative procedures used to effect the offsets pursuant to the August 2000 regulations become an issue only if the court finds the note enforceable against the Sewards.

### EQUITABLE ESTOPPEL

] Petitioners argue that principles of equitable estoppel prevent the government from enforcing the Enshallah note. "It is well settled that the government may not be estopped on the same terms as any other litigant," and thus it necessarily follows that if estoppel were to be available against the government at all it would "at least" require demonstrating all the traditional equitable prerequisites. *United States v. Perez–Torres*, 15 F.3d 403, 407 (5th Cir.1994)(*quoting Heckler v. Community Health Services of Crawford*, 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)). The Fifth Circuit has held that there must likely be some form of "affirmative misconduct" by a governmental agency before equitable relief can be afforded. *Fano v. O'Neill*, 806 F.2d 1262, 1265 (5th Cir.1987); and further "a private party must allege more than mere negligence, delay, inaction, or failure to follow an internal agency guideline." *Id. See also, United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir.1996).

 Petitioners contend that there were numerous instances of affirmative misconduct by representatives of the FmHA/FSA which should cause this Court to invoke the doctrine of equitable estoppel. First, petitioners contend that the failure of FmHA to include the Enshallah Ranch note in the analysis for the net recovery buyout agreement was a justifiable basis upon which the petitioners could rely that they were not indebted thereon. If that was the only argument of the petitioners, the Court would be reluctant to impose equitable estoppel. However, there is more.

Dickie Joe Ladner purchased the Sewards' interest in Enshallah Ranch effective January 31, 1981. (R.9630 at 164–178) The dissolution agreement provided that not only would Dickie Joe Ladner assume all outstanding debts and liability but that he would also indemnify the Sewards. (R.9630 at 172) Ladner immediately wrote to an FmHA official in his county office providing a copy of the dissolution agreement and informing them of his purchase of the Sewards' interest in Enshallah Ranch. He also requested that the Sewards be relieved from any obligation under those notes. Shortly thereafter the county official responded to Ladner declining to release the Sewards, but not advising the Sewards thereof. (R.9630 at 39 and 181)

One of the regulations guiding the United States Department of Agriculture Farmers Home Administration is CFR § 1951.7(c). That section states "county supervisors will notify borrowers of the dates and amounts of payments that have been agreed on for all types of accounts.... These notices will be timed to reach borrowers immediately before the receipt of the income from which the payment should be made or before the installment due date on the note, as appropriate." *Id.* Under the facts of this case and applicable regulations, the Sewards should have received notice of the delinquency of the Enshallah note at least annually. It is undisputed that for sixteen years the Sewards received none of these required notices. For sixteen years FSA had a duty to notify the Sewards that the Enshallah note was delinquent, but failed to do so.

The record before this Court is clear that the last payment on the Enshallah Ranch note was made in 1988, for a 1984 delinquency. (R.9630 at 113) It is also undisputed that from 1981 to 1997 United States Department of Agriculture Farmers Home Administration had no communication with the Sewards regarding the Enshallah Ranch note (R.9630 at 181) and that Farmers Home Administration during that time regarded this note as the debt of

Ladner. Even on September 9, 1998, the county farm loan manager, Jackie Williamson, wrote the Sewards and advised them that they could only see the Enshallah file up until they deeded their interest to the Ladners and that after that time Mr. Ladner would have to give written permission to allow them to review the file. That could only be true if the Farmers Home Administration understood and agreed that the debt was that of Ladner, and not of the Sewards. If it was still the Sewards' debt, they certainly had a right to see the loan file. This is clear proof that the Farmers Home Administration viewed this debt for sixteen years as solely the debt of Ladner.

The most compelling case for application of the doctrine of equitable estoppel, however, comes in Ladner's bankruptcy and the actions of the Farmers Home Administration in dealing with the real property which secured the Enshallah Ranch note. Ladner's First Amended Plan of Reorganization provided for an annual installment of $16,000 to be paid to FmHA. (R.9630 at 185–189) The plan of reorganization made no provision for FmHA to retain its lien evidenced by its deed of trust on the Enshallah Ranch property securing the 1979 note. The Bankruptcy Code provides that a plan of reorganization that does not specifically provide for the retention of the lien for a secured creditor effectively releases the lien and substitutes the creditor's lien with the right to receive the cash proceeds provided for in the plan. *See* 11 U.S.C. § 1141(c). The government failed to object to this plan. Dickie Joe Ladner's bankruptcy plan was confirmed by the Bankruptcy Court on May 10, 1985. (R.9630 at 196–218) The confirmation of that plan resulted in the Farmers Home Administration losing its priority lien on the property. FmHA did not appeal the confirmation of Ladner's bankruptcy plan as was done by other creditors. Ultimately, the other appealing parties reached an agreement with Ladner and, based on that agreement, the plan was affirmed by the United States District Court. (R.9630 at 219–231)

The United States Bankruptcy Court entered an order on July 12, 1985, confirming that FmHA had lost its priority lien on the land securing the Enshallah note.[11] (R.9630 at 329–331) A second Order was entered on July 16, 1986, once again confirming that Ladner could sell the property securing the Enshallah note free and clear of the FmHA lien. (R.9630 at 332–333) This Order was approved as to substance and form by the Farmers Home Administration Counsel. Another Order entered by the United States Bankruptcy Court on June 26, 1987, which was agreed to by the attorney for the Farmers Home Administration,[12] provided "that Dickie Joe Ladner shall be entitled to sell, mortgage, encumber, hypothecate, lease, convey, or in any way deal with the property described in the July 12, 1985, Order of this Court in any manner he may see fit, free and clear of any and all liens of any kind or nature whatsoever...." (R.9630 at 334)

At oral argument, Counsel for the government first contended that FmHA had not agreed to the disposal of Ladner's land securing the Enshallah note during the bankruptcy proceeding. However, the record indicates otherwise. Counsel for the government finally conceded that indeed such was the case and that the gov-

---

11. The order was requested by Counsel for Ladner for recording in the land records to cure any questions regarding liens against the property.

12. The Assistant U.S. Attorney who signed this agreed order and who represented FmHA through much of the Ladner bankruptcy proceedings is the same attorney representing FSA in this proceeding.

ernment had agreed to forego its lien on the property securing the Enshallah note and to allow Dickie Joe Ladner to sell it free and clear of that lien. No notice of this proceeding was ever furnished to the Sewards nor were they given any benefit therefrom. If Farmers Home Administration had complied with 7 C.F.R. § 1951.7(c) and sent the proper notices to the Sewards regarding the Enshallah note, they would have been informed of all of these proceedings. That was not done.

The record shows that by 1989 the Enshallah Ranch property was appraised by Ladner's appraiser at $825,000—more than enough to satisfy the Enshallah Ranch note. (R.9630 at 260–261) At that point in time, however, the Federal Land Bank had a first lien on the property as a result of FmHA failing to protect its first lien during Ladner's bankruptcy. FmHA also failed to attempt to seek a modification of Ladner's bankruptcy plan when Ladner defaulted under the terms thereof.[13]

The Sewards also contend that when they approached FmHA in 1986 to restructure all their debts and later entered into the net recovery buyout recapture agreement, Farmers Home Administration affirmatively represented to them on multiple occasions that all they owed were the five loans unrelated to the Enshallah Ranch. The documentation provided to this Court in the record supports this contention.

Based on the all of the foregoing, the petitioners contend that the actions of FmHA constitute affirmative misconduct which rises above simple negligence entitling the Sewards to equitable relief from this Court. The actions of USDA, FmHA personnel in connection with the handling of Dickie Joe. Ladner's bankruptcy by allowing him to sell the Enshallah Ranch collateral free and clear of the lien without satisfying the lien and without notice to the Sewards is affirmative misconduct in dealing with the collateral. Additionally, FmHA never notified the Sewards from 1981 to 1997 of the status of the Enshallah Ranch note nor any of the details concerning the delinquencies on the note or the bankruptcy proceedings involving the collateral.

The Court concludes that due to numerous affirmative acts over a sixteen year period of time during which the government actions clearly signified that the government considered this debt to be that of Ladner, not the Sewards, and due to the fact that the government's actions, through intent or gross negligence, resulted in detriment to the Sewards, that even as to the government, equitable estoppel applies and the government cannot offset against petitioners. This is the first time in twelve years on the bench that this Court has ever applied the doctrine of equitable estoppel against the government. This is one of those rare cases in which the doctrine of equitable estoppel should be, and is applicable to the government.

### PETITIONERS' OBLIGATION WAS RELEASED

▮ Even if equitable estoppel did not apply, the Fifth Circuit Court of Appeals

---

**13.** Ladner failed to make timely payments to FmHA under the confirmed plan. As a consequence thereof, a notice of alternative servicing options was sent to Ladner by FmHA in August 1989. After failure of Ladner to provide a completed servicing package, the notice of intent to accelerate the debt was issued in February 1990. Again, the Sewards were not given notice. FmHA failed to take any steps through the Bankruptcy Court or otherwise to collect the debt from Ladner thereafter. There is unrefuted evidence in the record that Ladner sold the land securing the Enshallah note as well as other assets which greatly exceeded the amount owing on the Enshallah note and no effort was made to collect this delinquent debt from Ladner, or to require Ladner to make payment under the confirmed bankruptcy plan.

has held at least twice that when the government releases security which could have stood as payment for a debt, co-obligors are released thereby. *See St. Paul Fire & Marine Ins. Co. v. Commodity Credit Corp.*, 646 F.2d 1064 (5th Cir. 1981), and *United States v. Continental Casualty Co.*, 512 F.2d 475 (5th Cir.1975). Under the authority of these two Fifth Circuit Court cases, Petitioners were also released from their obligations under the Enshallah note.

## STATUTES OF LIMITATION

The petitioners also contend that two statutes of limitation bar the government's proceeding in this action. They are 28 U.S.C. § 2415(a), which is a general six-year statute of limitation, and 31 U.S.C. § 3716, the ten-year statute of limitation applicable to administrative offsets.

### A. 28 U.S.C. § 2415(a)

28 U.S.C. § 2415(a) provides in relevant part:

> Every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues. . . .

The government takes the position in its brief in support of its motion for summary judgment that the note was never accelerated and thus no right of action had "accrued" at the time of the commencement of the offset actions.[14] The petitioners contend that the above referenced 1990 notice of intent to accelerate sent to Enshallah Ranch was an acceleration. The Court must decide whether the debt was in fact accelerated or a right of action had otherwise "accrued" to the government at such a time as to make attempted collec-

tion of the note in 1997 outside the six year statute of limitation contained in § 2415(a).

In regard to acceleration, the government cites authority that a demand for acceleration of an obligation must be an affirmative act that shows without doubt that the creditor has exercised the option to demand payment not only on any past due payments but on all future payments as well. Additionally, the debtor must be apprised that the option has been exercised. As pointed out above, the government's June 1991 brief in Ladner's bankruptcy proceeding clearly states that the notice of intent to accelerate was viewed by the government as an acceleration of that note. The position taken by the government in its brief before this Court and the position taken before the Bankruptcy Court in this division are inconsistent. The government clearly contended that the debt had been accelerated in briefing the issue of Dickie Joe Ladner's bankruptcy. To now contend that the debt was not accelerated is disingenuous.

The primary basis for petitioners' original argument that § 2415(a) applied was based on the Fifth Circuit cases of *FDIC v. Belli*, 981 F.2d 838 (5th Cir.1993), and *SMS Financial, LLC v. ABCO Homes, Inc.*, 167 F.3d 235 (5th Cir.1999). Both of those cases discussed § 2415(a) in conjunction with the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) and the limitation period provided therein for the recovery of debts inherited by the FDIC. In both of those cases, the Fifth Circuit determined "that a cause of action accrues when it comes into existence." *Belli*, 981 F.2d at 840. The Fifth Circuit went further in *SMS* and determined that "a cause of action accrues for purposes of § 2415(a) when the debtor defaults and not when the FDIC acquires

---

**14.** The government contends that the note must have been properly accelerated or have

matured for a right of action to have "accrued" within the meaning of § 2415(a).

the right to sue on the note. . . ." 167 F.3d at 241. In reaching its conclusions in both of these cases, the Fifth Circuit relied on *United States v. Lindsay,* 346 U.S. 568, 74 S.Ct. 287, 98 L.Ed. 300 (1954). The *Lindsay* court held "in common parlance a right accrues when it comes into existence. . . ." 347 U.S. at 569, 74 S.Ct. 716. Based on this definition of "accrued," petitioners originally argued that when Ladner defaulted on the Enshallah note as early as 1984 or at least no later than 1988, the statute of limitation began to run.

The Fifth Circuit recognized in *Belli,* however, that a number of courts around the country have determined that "accrued" in regard to § 2415(a) means that the statute does not begin to run until there is a right to sue on the underlying obligation. While the Fifth Circuit in *Belli* and *SMS* found that such right accrued upon default of the obligor, other Circuits have disagreed. It is argued by the government that the consensus among the other Circuits is that the limitations period under § 2415(a) does not begin to run until the government has actually accelerated the underlying obligation because of default or the note reaches maturity without being paid, at which point it acquires a right to sue. At oral argument, the petitioners agreed with the government's position that this is a correct interpretation of § 2415(a). Petitioners argue, however, that the note was in fact accelerated in 1990 and even under the government's definition of "accrued" the offset is barred.

█ Based on administrative records that demonstrate the government gave Notice of its Intent to Accelerate the debt in February 1990 in a notice to Enshallah Ranch and the government's position in their trial brief in the Ladner bankruptcy that the debt was in fact accelerated, the Court finds that the debt was accelerated in 1990. A party cannot take a position in one judicial proceedings and then change its position in another judicial proceeding. *See In re: Coastal Plains, Inc.,* 179 F.3d 197 (5th Cir.1999). Therefore, the debt was barred under 28 U.S.C. § 2514(a) in 1997 when the government first began its attempt to offset.

█ Further, the Fifth Circuit has determined that, at least in the FIRREA context, "accrued" is defined differently in this Circuit than in cases from other circuits cited and relied upon by the government. Under Fifth Circuit precedent interpreting § 2415, the right of action accrues for purposes of that section when a creditor is first able to assert a legal claim against a debtor for collection of the debt. That is when the debt becomes delinquent to the point that acceleration of the note is available or at the maturity thereof. Clearly there were no payments made on this note from 1984 forward except the payment in 1988 for the 1984 delinquency. Once the note became delinquent the government had the right to accelerate the note and commence legal action thereof. It is the opinion of this Court that under Fifth Circuit case law not only did the government have that right, but it had the obligation to exercise that right.

Regardless of whether the word "accrued" is interpreted as argued for by the government, or as originally argued for by petitioners, the § 2415 statute of limitations ran before the government attempted to offset. The agency's determination that the § 2415 statute of limitations had not run is contrary to law.

### B. 31 U.S.C. § 3716

█ The petitioners also argue that the government's claim is barred by 31 U.S.C. § 3716. This statutory section deals with administrative offsets by agencies of the United States Government and does not allow offsets when the claim has

been outstanding for more than ten years. ("[T]his section [allowing offsets] does not apply—1) to a claim ... that has been outstanding for more than ten years; ...." (31 U.S.C. § 3716(e)). The government contends that "outstanding" must be interpreted the same as "accrue" under 28 U.S.C. § 2415. Indeed, 31 C.F.R. § 901.3 defines "outstanding" under § 3716 as synonymous with "accrue" under § 2415(a). According to this regulation, a claim with the agency will not be deemed "outstanding" until a notice of acceleration has been sent. The petitioners contend that the interpretation of "outstanding" urged by the government and specified in 31 C.F.R. § 901.3 is an erroneous interpretation of 31 U.S.C. § 3716 and is contrary to the plain meaning of the word. If Congress had meant for the two statutes of limitation to be treated identically, it could have employed the word "accrued" in Section 3716(e). It did not do so. Congress used the word "outstanding." The *American Heritage Dictionary* defines outstanding as being "unpaid." There were no payments on the Enshallah note after 1988. Even the government concedes the note was seriously delinquent from 1984 forward. Clearly the debt on the Enshallah note was "outstanding" for more than ten years prior to the collection activities resulting from the 2000 statute changes.

 The Court recognizes that an agency's interpretation of a statute which it is charged with administering is entitled to great deference. *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Nevertheless, the Court finds that the government's reliance on its regulations to define "outstanding" under § 3716 as equivalent to "accrued" under § 2415 is erroneous and contrary to the law. Clearly the two words do not mean the same thing. Such an interpretation is not reasonable.

Although the FSA began its efforts to offset in 1997, the right to offset now claimed by FSA did not come into existence until August 21, 2000, when a new regulation was adopted. The debt sought to be offset has been outstanding at least since 1988, if not since 1984. Hence, the offset taken in 2000 occurred at least twelve years after the debt became "outstanding."

Even if the Court were to construe outstanding and accrued to have the same meaning as argued for by the government, nevertheless, based on the reasoning of the Court set out above as to § 2415, the government's claim accrued no later than 1990, so the offset would still be prohibited under § 3716 even if the Court interpreted the word "outstanding" to mean the same as "accrued." Consequently, whether the government's interpretation or plaintiff's interpretation of the word "outstanding" is accepted, any offset of the Enshallah note against plaintiffs, after February 2000, was and is barred by § 3716.

## NET RECOVERY BUYOUT/RECAPTURE AGREEMENT

 The petitioners further contend that the Net Recovery Buyout/Recapture Agreement of 1994 prevents the government from collecting the Enshallah note. The Court set forth in the factual section the circumstances surrounding the entry of this agreement by the Sewards and the United States.

 Petitioners contend that entering into negotiations with the Sewards and representing that all notes were considered in arriving at the net recovery buyout figures and then monitoring the Sewards and canceling the note and deed of trust which supported it created an accord and satisfaction by the government. Under Mississippi law the basic elements of accord and satisfaction are that if something of value is offered in full satisfaction of a

demand, accompanied by acts and declarations which amount to a condition that if the thing offered is accepted, it is accepted in satisfaction of the debt, acceptance of such offer, constitutes an accord and satisfaction. *See FDIC v. Brewer,* 823 F.Supp. 1341 (S.D.Miss.1993).

The petitioners contend that the net recovery buyout agreement satisfies all the conditions of an accord and satisfaction under Mississippi law. There was no reservation in the agreement as to the Enshallah note. The petitioners urge this Court that this case is analogous to *Preferred Risk Mutual Company v. Collier,* 712 F.Supp. 96 (S.D.Miss.1989). In *Preferred Risk* Judge Lee enforced a settlement agreement that made no express reservation of rights. Judge Lee interpreted Mississippi law as being in accord with the majority of jurisdictions that a release which does not specifically reserve certain rights is deemed to be a settlement of all possible claims.

There is merit to the petitioners' contention. The government's certification that all of the records had been searched and all of the notes owed by the Sewards were considered in arriving at the net recovery buyout figures would seem to this Court to meet the requirements of an accord and satisfaction. Petitioners candidly admitted that the government probably never in fact considered the Enshallah note in this agreement. But, the record is replete with evidence that the government did not consider the Sewards indebted on the Enshallah note from 1981 to 1997.

The first documents related to the net recovery buyout agreement were furnished to the Sewards as early as 1986. However, because of the moratorium previously addressed, the agreement was not able to be consummated until 1994. During that eight year interim, USDA FmHA had ample opportunity to fully review its files and determine the total indebtedness of the Sewards. The fact that it did not seems to amount to, at the very least, an extreme lack of diligence.

This Court is of the opinion that the net recovery buyout agreement entered into in 1994 between the parties was an accord and satisfaction. Clearly the government had at its disposal the tools necessary to discover and provide for a correct calculation of all debts owed by the Sewards to the United States. A plain reading of the net recovery buyout agreement and the documents related thereto indicate to this Court that all the parties thought this was all of the debts owed by the Sewards to the Farmers Home Administration. To hold otherwise would defeat the purpose of the entire program. Under applicable law the Enshallah note would likely have been written off.[15] Petitioners, to their detriment, relied on the government's representations and complied with the agreement entered into. The government now says "we didn't mean what we said." That they cannot do. The Court finds that collection on this note is barred by the net recovery buyout agreement and the finding to the contrary by the National Appeals Division is erroneous and contrary to law.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the October 29, 1999, decision of the United Stated Department of Agriculture, National Appeals Division which held that the Enshallah Ranch note was still enforceable against the Sewards is hereby reversed as erroneous and contrary to the law.

IT IS FURTHER ORDERED AND ADJUDGED, based on the foregoing, that

---

**15.** Whether the debts of petitioners should or should not have been written off is a matter of public policy to be determined by Congress, not this Court.

the Enshallah Ranch note of 1979 is unenforceable as to the Sewards.

IT IS FURTHER ORDERED AND ADJUDGED that any decision of the United States Department of Agriculture, National Appeals Division which is contrary to this Court's finding that the Enshallah Ranch note is not enforceable is hereby reversed.

IT IS FURTHER ORDERED AND ADJUDGED that the petitioners may present an EAJA petition for attorney's fees and expenses for consideration by the Court within thirty days from the date of this Order. If petitioners elect to file such a petition, petitioners shall file a memorandum brief not to exceed eight pages responding to the government's argument that attorney's fees under the EAJA are not applicable, to which the government may file a rebuttal brief of no more than five pages within ten days thereafter.